**BARRETT et al. v. DENVER TRAMWAY CORPORATION.**

No. 8575.

Circuit Court of Appeals, Third Circuit.

Argued May 15, 1944.

Decided Dec. 13, 1944.

Andrew P. Quinn, of Providence, R. I., and Stewart Lynch, of Wilmington, Del. (Frank Licht, of Providence, R. I., on the brief), for appellants.

Erskine R. Myer, of Denver, Colo. (Hastings, Stockly and Layton and Caleb R. Layton, 3rd, all of Wilmington, Del., and Hughes & Dorsey, of Denver, Colo., on the brief), for appellee.

Before DOBIE and McLAUGHLIN, Circuit Judges, and KALODNER, District Judge.

McLAUGHLIN, Circuit Judge.

This matter arises out of the recapitalization of a Delaware corporation which eliminated accrued dividends on its old preferred shares. Suit was brought by preferred stockholders who attacked the then proposed plan as unfair. Diversity of citizenship is the basis of federal jurisdiction. The District Court dismissed their complaint.

There is a preliminary question on the appellee's motion to dismiss the appeal. The grounds for the motion are: (a) Failure on the part of the appellants to file the bond referred to in the order of this court of January 27, 1944, and (b) that all acts sought to be enjoined have been performed and that the case is moot. The first part of the January 27, 1944, order enjoins the plan of recapitalization and related acts. Its final paragraph reads: "3. This order shall become effective upon the Plaintiffs-Appellants' filing with the Clerk of this Court a bond in the sum of Twenty Thousand Dollars ($20,000.00), with corporate surety to be approved by a Judge of this Court, conditioned that if the Plaintiffs-Appellants shall prosecute their appeal to effect and answer all damages sustained by the Defendant-Appellee and costs, if they fail to make such appeal good; it being understood that such bond shall not be considered as paying any damages which may have resulted prior to the date hereof."

The bond was not filed, with the result that the injunctive part of the order never went into effect. The defendant, having been advised by the plaintiffs that such bond would not be filed, consummated its plan. Plaintiffs went on with their appeal without injunctive relief and among other steps in the cause did actually file the customary $250 cost bond.

The contingent language of the order is plain and is based upon Rule 73(d) Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which reads: "Supersedeas Bond. Whenever an appellant entitled thereto desires a stay on appeal, he may present to the court for its approval a supersedeas bond which shall have such surety or sureties as the court requires. * * * *"

In order to obtain the sought for injunction pending this appeal, plaintiffs were required to post the stated bond. They chose to continue their appeal without the protection of a restraint against the defendant and in so doing did not violate the above referred to order. The mechanics of the appeal itself were prosecuted diligently under the circumstances.

Nor do we see that the controversy has been rendered moot by the fact that the defendant has followed through on its reclassification program. The prayers for relief in the complaint in addition to seeking restraint of the plan asked that "said plan and amendments be declared null and void" and for "such other and further relief as this honorable court may deem meet and proper." The illegality of the plan, because of its alleged unfairness, is vigorously urged in this court as it had been below. Plaintiffs are entitled to have that question passed upon. In United States v. Bates Valve Bag Corporation, D.C.Del., 39 F.2d 162, at page 164, the court said: " * * * in a suit in which the pleadings disclose a proper case for injunctive relief when the suit was instituted and a prayer for an injunction and incidental relief, the removal during the pendency of the suit of the grounds for injunctive relief does not take away the jurisdiction or bar the court from granting the incidental relief, if upon final hearing the allegations are sustained by proof." And see cases there collected.

The one point on the merits of this appeal is whether the plan was fair to the preferred stockholders. This is a diversity case with a question of substantive right involved. Under the facts here, Delaware law controls the issue and it is our duty, as it was the duty of the trial court, to ascertain and apply the law of that State. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487;

Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109; Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7; Huddleston et al. v. Dwyer et al., 322 U.S. 232, 64 S.Ct. 1015; Lich v. United States Rubber Co., D.C.N.J., 39 F.Supp. 675, affirmed per curiam 3 Cir., 123 F.2d 145.

The Denver Tramway Corporation, which operates the public transportation system in Denver, Colorado, was incorporated under the Delaware Corporation Act in 1925 following a federal receivership reorganization. Its certificate of incorporation provided, inter alia: "The holders of preferred stock shall be entitled to receive out of the surplus or net profits of the corporation * * * dividends * * * *" This limitation in regard to the funds out of which preferred dividends could be paid was in keeping with the law as it then existed in Delaware.[1] In 1927 the statute was changed in such a way as to empower the directors of a corporation to declare and pay dividends on shares of capital stock out of net assets in excess of capital or current net profits, subject to any restrictions in the corporate charter.[2]

In September, 1943, when the plan under consideration was proposed, defendant corporation had outstanding 104,412 shares of cumulative preferred of a par value of $100 and 61,240 shares of common, without par, representing capital of $10,441,200 and $7,670,576.58 respectively.

Preferred enjoyed the usual privileges over common:

(a) Though both preferred and common had full voting power, this passed exclusively to preferred whenever preferred dividends were in arrears in excess of $\frac{1}{4}$ of 1% for one year or more.

(b) Preferred was entitled to dividends of 7% per annum on the par value of $100 per share out of the surplus or net profits of the corporation before any dividends could be paid on common, whenever the directors so declared a dividend. The dividends were cumulative as to the first 5% per annum whether earned or not, and cumulative as to the next 2% if earned. Common was not entitled to any dividends until preferred's current and accumulated dividends had been paid.

(c) Preferred, in the event of dissolution, winding up or liquidation was entitled to receive its par value plus an amount equal to all accumulated and unpaid dividends at the rate of 7% per annum to the date of distribution, before any distribution to common, though it was not entitled to share in any assets left after the payment of such amounts.

Common was entitled to receive such dividends as the directors should declare

---

[1] Revised Code of Delaware of 1915, Ch. 65, Sec. 34 (§ 1948):

"Dividends; Reserves:—The Directors of every corporation created under this Chapter shall have power, after reserving over and above its capital stock paid in, such sum, if any, as shall have been fixed by the stockholders, to declare a dividend among its stockholders of the whole of its accumulated profits, in excess of the amount so reserved, and pay the same to such stockholders on demand; provided, that the corporation may, in its certificate of incorporation, or in its by-laws, give the Directors power to fix the amount to be reserved."

Revised Code of Delaware of 1915, Ch. 65, Sec. 35 (§ 1949):

"Dividends; How Declared and Paid; Violations of Section; Penalty; Exoneration from Liability:—No corporation created under the provisions of this Chapter, nor the directors thereof, shall make dividends except from the surplus or net profits arising from its business. * * * *"

[2] Section 34 (§ 2066) Revised Code now provides:

"Dividends; Reserves:—The directors of every corporation created under this Chapter, subject to any restrictions contained in its Certificate of Incorporation, shall have power to declare and pay dividends upon the shares of its capital stock either (a) out of its net assets in excess of its capital as computed in accordance with the provisions of Sections 14, 26, 27 and 28 of this chapter, or (b) in case there shall be no such excess, out of its net profits for the fiscal year then current and/or the preceding fiscal year; provided, however, that if the capital of the corporation computed as aforesaid shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the directors of such corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency in the amount of capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired."

out of the surplus or net profits of the corporation, after all preferred dividend requirements had been met and accumulated dividends paid.

From 1926 to 1931, inclusive, dividends in ever diminishing amounts were paid on preferred; since 1931, no preferred dividend whatever was paid. As a result, accrued and unpaid dividends on preferred up to June 30, 1943, amounted to $69.875 per share, or a total of $7,295,788.50.

Meanwhile, war conditions had caused a sudden and tremendous increase in the earnings of defendant, as shown by the following table:

| Year | Profit | Loss |
|------|--------|------|
| 1938 | .... | $ 7,544. |
| 1939 | $ 26,518. | .... |
| 1940 | .... | 28,023. |
| 1941 | 121,356. | .... |
| 1942 | 770,275. | .... |
| 1943 to June 30 | 569,555. | .... |

Between the years 1925 and 1943, the defendant had reduced its bonded indebtedness from $10,969,000 to $2,915,500. A modernization program was started in 1938 and continued until the war forced its suspension. This involved the replacement of much of the company's equipment. The corporation's capital was seriously impaired, and though the balance sheet as of June 30, 1943, showed a surplus of $1,155,151.18, a deficit in fact existed.

For several years there had been agitation by the preferred stockholders, including the plaintiffs, for the payment of dividends currently to preferred stockholders. Various plans to accomplish this end were proposed and studied by the management. The directors were advised by counsel that under the circumstances, with the capital of the company impaired, an amendment to the certificate of incorporation was a prerequisite to the payment of dividends to preferred if the directors were to escape personal liability for such an act.

Finally, on September 1, 1943, the Board of Directors endorsed and proposed to the stockholders a plan which created a new class of noncumulative prior preferred stock. Holders of the new shares were to receive a dividend of $2.50 per share in 1943. Each year thereafter they were to receive $3.50 per share prior to the payment of any dividend on old preferred. Up to 50% of the net earnings of the corporation were to be applied to the payment of dividends on new preferred to the extent of $2.50 per share. Dividends on old preferred became noncumulative after January 1, 1943. All classes of stock were given one vote for each share at all meetings of stockholders. Holders of old preferred had the choice of retaining the old preferred or exchanging one share of old preferred for two of the new with the proviso that if the latter were accepted, then all claims for unpaid accumulated dividends to December 31, 1943 were to be waived. Before any dividends were payable on common, the new preferred was to receive $3.50 a share, and current dividends of $7 a year with all unpaid accrued dividends through December 31, 1943, were to be paid on the old preferred stock. On liquidation or redemption, old preferred became entitled to its par value of $100 a share plus all unpaid accumulated dividends. In such event two shares of new preferred would be the equivalent of one of the old.

The plaintiffs own 3200 shares of preferred stock, all of which were voted against the proposed plan. At a stockholders meeting held on October 11, 1943, the plan was overwhelmingly approved as shown by the following table of votes cast:

For the resolution:
| | | |
|---|---|---|
| Preferred Stock | 67,110 | shares |
| Common Stock | 45,132 | shares |
| Total | 112,242 | shares |

Against the resolution:
| | | |
|---|---|---|
| Preferred Stock | 3,710 | shares |
| Common Stock | 2,000 | shares |
| Total | 5,710 | shares |

Before the adoption of the plan plaintiffs notified defendant of their opposition, and on October 8, 1943, three days prior to the aforementioned meeting, they filed a bill of complaint in the District Court seeking to enjoin its consummation. The plan entailed amending the certificate of incorporation of the defendant, and defendant agreed orally to withhold action on such amendment until the decision of the District Court. On January 7, 1944, that court entered a final decree dismissing the bill of complaint. Defendants filed a notice of appeal on January 11, 1944, and on January 27 of the same year asked for an injunction pending appeal. As stated, the application for an injunction was granted by this court conditioned upon the filing of a bond in the sum of $20,000 by the plaintiffs for any damages and costs which might result to

defendant if plaintiffs did not prosecute their appeal to effect. The plaintiffs did not post such bond, and on February 24, 1944, the corporation filed the certificate of amendments according to the laws of Delaware. A subsequent meeting of stockholders on March 21, 1944, approved the amendments and requested that dividends be paid as provided. Certain dividends have already been paid and others will be as they fall due.

The method of presenting the plan to the stockholders is assailed by the plaintiffs in connection with their contention of unfairness. As a result of counsel for the company advising the directors that the certificate of incorporation had to be amended in order to pay dividends currently on the preferred stock, the plan was formulated and sent out to the stockholders together with a letter from the president which read in part as follows:

"Broadly speaking, the meeting is to be held in order to give the stockholders of the corporation an opportunity to consider and vote upon amendments to Article Fourth and Article Ninth of the Certificate of Incorporation of The Denver Tramway Corporation in order to effectuate the Plan of Recapitalization unanimously adopted by the Board of Directors at the meeting held on the tenth day of August, 1943.

"The Board of Directors for many months has given very careful consideration to the problem of dealing with dividend accumulations on the Preferred Stock of your Corporation and to methods of enabling the Corporation to declare and pay dividends to the present holders of Preferred Stock from annual net profits. The solution of these problems has required the consideration of many other important related questions, such as taxes, accrued depreciation, and the modernization of the properties of the Corporation, which has been delayed by war conditions. The proposal fully set forth in the Plan of Recapitalization (Exhibit A) and accompanying amendments has the complete approval of the Board of Directors, has been devised after careful study, and is unanimously recommended to the stockholders for adoption as equitable and advisable and in the best interests of the Corporation and its stockholders."

The appellants suggest that under the 1927 amendment to the Delaware Corporation Act, supra, the then proposed amendments to the Denver Tramway charter were not necessary in order to pay current dividends on preferred shares and, therefore, that the president's letter was misleading. It is their thought that the 1927 amendment should be read into the defendant's charter and that the amendment of itself gave the right to the company to pay preferred dividends from current profits. The appellee argues that amending the Tramway charter was necessary or at least advisable because payment of such dividends out of current profits under the 1927 statute was expressly "subject to any restrictions contained in its Certificate of Incorporation." The appellee further calls attention to (a) The only provision in its charter for payments of dividends on preferred shares which reads: "The holders of the preferred shall be entitled to receive out of the surplus or net profits of the corporation * * * dividends * * *" and (b) that the Denver Tramway capital was admittedly impaired. The appellants say that the court below agreed with them that the 1927 statute took care of the problem. This is disputed by the appellee, who states that the trial judge refused to pass on the question because it was not directly before him and that he declined to enter a law conclusion submitted by the plaintiffs in line with their contention. The last paragraph of the particular footnote of the trial court's opinion would seem to support this: "However, plaintiffs' argument is simply directed at the main and only question presented, viz., fairness. In short, if a method is available to management to put preferred on a dividend paying basis the stockholders should not have been told, *as it is charged* they were, that the only manner of effecting a plan of reclassification was that found in the plan submitted and now before the court. But, such statements from management must be viewed in the light of the Delaware law as to whether those representations constitute 'bad faith' or 'constructive fraud' or, after acting on advice of counsel, 'an honest error of judgment.' *If* the statements made by the management were inaccurate, at most, they fall into the last category mentioned." (Emphasis ours.)

On this question of the manner of submitting the plan, the trial court did specifically hold in its findings of fact:

"39. At the stockholders meeting October 11, 1943, prior to the time a vote was taken upon the resolution providing for the

amendments, a statement of the plaintiffs was read to the stockholders advising them that in the opinion of the plaintiffs the plan and amendments were misrepresented and were designed to promote the interests of the holders of Common Stock at the expense of holders of the Preferred Stock; and a letter from the counsel for the plaintiffs to the President of the corporation was read advising that in the opinion of the plaintiffs and their counsel the plan was prepared primarily for the benefit of the holders of Common Stock and to the detriment of the holders of Preferred Stock; that no legal obstacle existed to the payment of a dividend to the present Preferred stockholders; that the proposed amendments were not designed to promote the welfare of the company or to improve the position of the holders of Preferred stock, but were designed to improve the position of the holders of the Common Stock and were unfair and inequitable. Thereafter the plan and amendments were fully discussed and debated by all stockholders who desired to express their opinions regarding the same or discuss the matter in any way. After full discussion and notice that suit would be filed to prevent the consummation of the plan and amendments from becoming effective, the stockholders voted upon and adopted the resolution providing for the ratification, confirmation and approval of the action of the Board of Directors in adopting the Plan of Recapitalization and the amendments to Article Fourth and Article Ninth of the Certificate of Incorporation and authorizing, empowering and directing the directors to carry out the purposes of the resolution."

\*　　\*　　\*　　\*　　\*

"47. The management of the corporation, composed of the Board of Directors and its officers, is made up of men of integrity, honesty and excellent reputation in the community in which they live and no fraud, either actual or constructive, on their part or on the part of any of them or the majority stockholders was practiced in the preparation, proposal, submission and adoption of the Plan of Recapitalization and the Amendments to Article Fourth and Article Ninth of the Certificate of Incorporation."

In the forty-eighth, forty-ninth and fifty-first findings of fact, the court also found: that the officers and directors of the defendant fully and fairly presented to the stockholders the legal and practical effect and purposes of the said plan and amendments; that they, and the majority stockholders, acted as the result of good faith with regard to the rights of others in the preparation, submission and adoption of the plan and amendments; and that the amendments were proposed in good faith without misrepresentation or fraud, either actual or constructive, and more freely adopted after full disclosure. A careful examination of the record shows that these findings are borne out by substantial evidence. Certainly we cannot hold that these findings are clearly erroneous. Federal Rules of Civil Procedure, Rule 52(a).

Under the Delaware law in order for the plan involved here to be held unfair it must amount to at least constructive fraud. It can be safely stated that all of the Delaware cases, even remotely touching the present question, have been ably discussed at length by counsel on both sides in the unusual number of briefs which have been filed. While there are no Delaware decisions dealing with the exact problem, this question of fairness has arisen in various merger cases under the Delaware Corporation Act. The latest opinion on the subject is Porges v. Vadsco Sales Corporation, Del.Ch.1943, 32 A.2d 148, at page 151, where Vice Chancellor Pearson said: "Complainant's case is simply that the allocation between the old preferred and common stockholders is so unfair that it amounts to fraud. When fraud of this nature is charged, the unfairness must be of such character and must be so clearly demonstrated as to impel the conclusion that it emanates from acts of bad faith, or a reckless indifference to the rights of others interested, rather than from an honest error of judgment."

In Bodell v. General Gas & Electric Corporation, 1927, 15 Del.Ch. 420, 140 A. 264, at page 267, Chief Justice Pennewill said:

"It may be impossible to lay down a general rule on this subject, but we think the discretion of a board of directors in the sale of its no par value stock should not be interfered with, except for fraud, actual or constructive, such as improper motive or personal gain or arbitrary action or conscious disregard of the interests of the corporation and the rights of its stockholders."

To the same effect, Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 1, 120 A. 486; Cole v. National

Cash Credit Association, 18 Del.Ch. 47, 156 A. 183; MacFarlane v. North American Cement Association, 16 Del.Ch. 172, 157 A. 396.

Hottenstein v. York Ice Machinery Corporation, 3 Cir., 136 F.2d 944, was also concerned with a merger under the Delaware Corporation Act. Judge Biggs there exhaustively discussed the Delaware decisions. On the question of fairness of the reclassification in that matter, after considering the Porges and Cole opinions, supra, he concluded that fraud, actual or constructive, must be present to restrain a merger. In Davis v. Louisville Gas & Electric Co., 16 Del.Ch. 157, 142 A. 654, there is a plain indication that the Delaware rule of unfairness would be applied to reclassification cases. The court there said at page 659 of 142 A.: "We have then, a conflict in view between the responsible managers of a corporation and an overwhelming majority of the stockholders on the one hand and a dissenting minority on the other—a conflict touching matters of business policy, such as has occasioned innumerable applications to courts to intervene and determine which of the two conflicting views should prevail. The response which courts make to such applications is that it is not their function to resolve for corporations questions of policy and business management. The directors are chosen to pass upon such questions and their judgment unless shown to be tainted with fraud is accepted as final. The judgment of the directors of the corporation enjoys the benefit of a presumption that it was formed in good faith and was designed to promote the best interests of the corporation they serve."

In addition to the lower court's findings of fact above detailed which directly relate to the fairness of the plan, the trial judge applying the test of Delaware decisional law to the issue here said in his opinion: "But my views are ineffectual in the light of my conclusion that the Delaware law controls. As there can be no possible finding of fact from the evidence adduced here to which the Delaware symbols of 'constructive fraud' or 'bad faith' or 'gross unfairness' may attach, the legal formula established by Delaware compels the result that plaintiffs' charge of unfairness can not be sustained."

Scrutiny of the testimony and exhibits reveals that the facts justify the findings of the trial court in this respect. In line with the thought expressed by Judge Leahy in his opinion below, it may well be that the vexing problem of the elimination of accrued dividends on preferred shares in such a situation as this litigation presents is a matter for Delaware legislative action, but as the corporation law of that state, both statutory and decisional, now stands, it calls for affirmance of the judgment of the District Court.

Affirmed.