**COLE v. LOEW'S INC. et al.**

No. 8005.

District Court, S. D. California, Central Division.

March 29, 1948.

Kenny & Cohn, by Robert W. Kenny and Morris E. Cohn, Charles J. Katz, and Gallagher, Margolis, McTernan & Tyre, by Ben Margolis, all of Los Angeles, Cal., for plaintiff.

Loeb & Loeb, Herman F. Selvin, and Milton A. Rudin, all of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

I

The Bias and Prejudice Which Disqualifies

### A. *How the Question Arises*:

On January 7, 1948, the plaintiff, Lester Cole, filed in the Superior Court of the State of California, for Los Angeles County, an action for declaratory and general equitable relief. California Code of Civil Procedure, Secs. 1060, 1061. On *January 26, 1948,* Loew's Inc., the defendant, filed a petition to remove the cause to the United States District Court for the Southern District of California, under the diversity statutes. 28 U.S.C.A. § 41(1) (b); 28 U.S.C.A. § 71.

These are the familiar sections which permit civil actions in which the matter in controversy exceeds the sum or value of three thousand dollars, and which is between citizens of different States to be removed to the Federal court, when the defendant is of different citizenship than the plaintiff. Corporations organized in one State and doing business in another, when sued by citizens of the State where their business is located, are thus enabled to have their causes tried in the Federal instead of the State Courts.

The defendant, being a Delaware corporation, was entitled to have the cause removed.

An Order of Removal was made on *February 2, 1948.* The delay which usually accompanies the transmission of the record to the District Court resulted in the cause not being filed in our court until *February 28, 1948.* When so filed, under the rotation system which obtains in assigning cases (Local Rule 2), the matter was first assigned to Judge McCormick and then to me. There are certain rules under which, when several cases of similar character are filed, the judge who has the case with the lowest number may have assigned to him more than one of these cases. Judges are not informed of the filings until copies of the pleadings begin to reach them. And I did not know of the filing of this action until a Motion for Judgment on the Pleadings, made by the plaintiff, with supporting memorandum, reached me on *March 6, 1948.* This Motion I heard on *March 15, 1948.* Notwithstanding reports to the contrary, which erroneously have crept into some of the press and radio, the *matter is undecided.*

It is true that during the course of the lengthy legal argument, as is the custom, certain colloquies occurred between the Court and counsel for both sides. They do not necessarily indicate what the decision will be. Often a Judge resorts to the Socratic method to ask questions to clarify the issues. And lawyers of experience know that in this and every other American court, they cannot claim a *vested interest* in any intimations given by the court as to its views on any phase of the matter. Matters of this importance are seldom decided from the Bench. They require further study. And, in many instances, lawyers are pleasantly surprised that the Judge, *on further study,* has ruled the other way. Lawyers are familiar with this phenomenon which is an accepted part of the American judicial technic, but lay persons are often baffled by it.

I refer to it in this case because of the intimation in some public channels of communication that, during the argument, I expressed definite views as to what my decision on some of the points of law involved might be. Actually, the entire controversy before me is very narrow. By the Complaint, the plaintiff, a writer with long experience in writing for motion pictures, seeks a declaration of his rights under his contract of employment with the defendant, dated December 5, 1945. The defendants, engaged in the production of motion pictures, exercising a right claimed under the contract, suspended the plaintiff on December 3, 1947, and stopped the payment of his salary, claiming that his conduct before the hearings of a Committee of the House of Representatives in refusing to answer certain questions violated his obligations under the contract of employment. Asserting that the statements are not true, the plaintiff, in his Complaint, claims that the defendants had no right to suspend him and to stop the payment of his salary. He seeks the Court to declare so and that he is entitled to compensation. He also seeks to restrain them from further enforcing the notice.

In an Answer filed March 2, 1948, the defendants admit the execution of the contract and the sending of the Notice, but deny the other matters. They assert their right to suspend. *They have also demanded a trial by Jury.*

In this state of the pleadings, the plaintiff made a motion for judgment on the pleadings upon the ground that the defenses raised by the Answer are not legally sufficient to raise an issue of fact and that, for this reason, the Court should forthwith render judgment in his favor.

■ It is to be *noted from this brief summary of the pleadings that the question before me is not the constitutional validity of the resolution creating the House Un-American Activities committee, commonly known by the name of its Chairman, The Thomas Committee, or its right to pursue its inquiries.* For that matter, I have no doubt of the constitutionality of its establishment. More, I believe, and have expressed the view repeatedly, that the right of congressional inquiry is a great adjunct of the democratic process and that fruitful legislation has resulted from the inquiries of special committees in the past, such as the Pujo, the Black and the LaFollette Committees. Nor, for that matter, is there before me the question of the right to ask the questions which were propounded to the witness before the Committee. The narrow question involved in this lawsuit which, because of diversity of citizenship, is governed by state law (see, Angel v. Bullington, 1947, 330 U.S. 183, 191, 67 S.Ct. 657; Barrett v. Denver Tramway Corporation, 3 Cir., 1944, 146 F.2d 701), is whether the plaintiff's conduct before the Committee was such as to warrant his suspension and the stoppage of his salary by the defendants.

■ In the motion for judgment on the pleadings, the sole question involved is whether, under the pleadings, there are issues left which call for a trial. *This issue I did not decide at the hearing. It is still under submission.*

Following the argument, on March 22, 1948, there was filed an application and affidavit to transfer the cause. It was based on an allegation that I have a personal bias and prejudice against the defendants and in favor of the plaintiff. The sole basis for this conclusion is the following statement appearing in the affidavit:

"Defendant is informed and believes and which, therefore, alleges that in the latter part of December, 1947, or the early part of January, 1948, (the exact date being unknown to defendant) and subsequent to the occurrence and publicization of the facts involved in this action, the Honorable Leon R. Yankwich, in the course of a discussion about the hearings before said Committee and of the ensuing indictments, suspensions and discharges, said in substance and effect that in his opinion there was no legal justification for the suspension or discharge of any of the persons whose conduct before the Committee resulted in their indictment; that he hoped that none of the cases arising out of such suspensions or discharges came before him but if they did, he would have no alternative but to render judgment for the plaintiffs in such actions; and that if he were the attorney for such plaintiffs, he could recover judgment in their favor for millions of dollars. Said statements, as defendant is informed and believes, and, therefore, alleges, were made during a social evening at the home of Mrs. Helen Melinkoff in Los Angeles, California, in the presence of several other persons including Mr. James Ruman, hereinafter referred to."

(B.) *The Federal Law of Disqualification.*

The affidavit was filed under Section 21 of the Judicial Code, 28 U.S.C.A. § 25, which provides, among other things:

"Whenever a party to any action or proceeding, civil or criminal, shall make and file an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein * * * Every such affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists."

The section is one-sided—a typical "shotgun" section. It is intended to cover extreme situations. It does not, as do State statutes, provide for counter-affidavits by the Judge and another judge to determine disqualification. California Civil Code of Procedure, Section 170. For this reason, and the opportunity of abusing the privilege it confers, ever since the enactment of the Statute in 1912, the Courts have sought to protect federal trial judges against the unilateralness of the procedure by limiting its scope strictly, and construing it literally and narrowly. See, Scott v. Beams, 10 Cir., 1941, 122 F.2d 777, 787, 788; Skirvin v. Mesta, 10 Cir., 1944, 141 F.2d 668, 672. The first and most important limitation came when the courts held that the bias and prejudice which disqualifies a judge is not some nebulous belief that he may have some preconceived ideas about a piece of litigation, but meant *personal* bias and prejudice or a bent or leaning against a litigant or in favor of another which, regardless of the merits of a cause, would make it impossible for him to judge the case dispassionately.

In an early case on the subject, Ex parte American Steel Barrel Co., 230 U.S. 35, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379, the Supreme Court said:

"The basis of the disqualification is that 'personal bias or prejudice' exists, by reason of which the judge is unable to impartially exercise his functions in the particular case. It is a provision obviously not applicable save in those rare instances in which the affiant is able to state facts which tend to show not merely adverse rulings already made, which may be right or wrong, *but facts and reasons which tend to show personal bias or prejudice.* It was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise, but to prevent his future action in the pending cause. Neither was it intended to paralyze the action of a judge who has heard the case, or a question in it, by the interposition of a motion to disqualify him between a hearing and a determination of the matter heard. This is the plain meaning of the requirement that the affidavit shall be filed not less than ten days before the beginning of the term." (Italics added)

In Wilkes v. United States, 9 Cir., 1935, 80 F.2d 285, 289, which arose in this District, it was sought to disqualify the late Judge George Cosgrove, on allegations that he was biased or prejudiced in a criminal case because in a civil case involving the same matters, he had made adverse rulings

to the particular litigant. The Court followed the same criterion promulgated by the Supreme Court in the case just cited and said:

"To satisfy the requirements of Section 21, the facts stated in the affidavit 'must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment.' Berger v. United States, 255 U.S. 22, 23, 41 S.Ct. 230, 233, 65 L.Ed. 481. The affidavit must 'assert facts from which a sane and reasonable mind may fairly infer bias or prejudice.' Keown v. Hughes, 1 Cir., 265 F. 572, 577. These facts 'should be set out with at least that particularity one would expect to find in a bill of particulars filed by a pleader in an action at law to supplement and explain the general statements of a formal pleading.' Morse v. Lewis, 4 Cir., 54 F.2d 1027, 1032.

"The affidavit in this case states that the affiant believes that Judge Cosgrave has a personal bias and prejudice against the defendants and in favor of the government, by reason of which the defendants cannot have a fair and impartial trial before him. As reasons for this belief, the affidavit states that civil actions relating to some of the matters involved in this criminal case were brought against some of the defendants in the criminal case in the same court where the criminal case is pending; that in these civil cases there were allegations charging the defendants with having committed certain wrongful acts; and that the court in the civil cases made certain rulings adverse to the defendants, some of which rulings were made by Judge Cosgrave. These matters cannot be said to disclose personal bias or prejudice within the meaning of section 21 of the Judicial Code. Sacramento Suburban Fruit Lands Co. v. Tatham, 9 Cir., 40 F.2d 894. See also, Berger v. United States, supra, 255 U.S. 22, page 31, 41 S.Ct. 230, 65 L.Ed. 481; Ex parte American Steel Barrel Co., 230 U.S. 35, 43, 33 S.Ct. 1007, 57 L.Ed. 1379."

Many cases decided since have declared the same rule. See, Ryan v. United States, 8 Cir., 1938, 99 F.2d 864, 871; Walker v. United States, 9 Cir., 1940, 116 F.2d 458, 462; Beland v. United States, 5 Cir., 1941, 117 F.2d 958, 960; Scott v. Beams, 10 Cir., 1941, 122 F.2d 777, 788, 789; Refior v. Lansing Drop Forge Co., 6 Cir., 1942, 124 F.2d 440; Price v. Johnson, 9 Cir., 1942, 125 F.2d 806, 811; Beecher v. Federal Land Bank of Spokane, 9 Cir., 1945, 153 F.2d 987.

In Price v. Johnson, 9 Cir., 1942, 125 F.2d 806, 811, our own Circuit Court of Appeals again emphasized the fact that the bias or prejudice is not the possession of definite views on the law or even a "prejudgment" of the controversy, but a personal attitude of enmity directed against the suitor making the application. The Court used this language:

"The allegations of appellant's petition for the writ of habeas corpus indicate that the affidavit of bias and prejudice was insufficient under the statute and, hence, was properly overruled. The statute requires that the bias or prejudice be 'personal.' The allegations of the affidavit, as disclosed by the petition for the writ, do not indicate a 'personal' prejudice or bias against the accused but charge an impersonal prejudice, and go to the judge's background and associations rather than his appraisal of the defendant personally. This is not enough under the statute, and the affidavit must be here held to have been insufficient under the law. The plain purpose of the statute 'was to afford a method of relief through which a party to a suit may avoid trial before *a judge having a personal bias or prejudice against him or in favor of the opposite party. That sought to be relieved against is a personal bias or prejudice—a bias or prejudice possessed by the judge specifically applicable to or directed against suitor making the affidavit or in favor of his opponent.'* Appellant's allegations reveal that 'the facts and reasons advanced in support of the charge of bias and prejudice do not tend to show the existence of a personal bias or prejudice on the part of the judge toward petitioner but rather a prejudgment of the merits of the controversy. * * *' " (Italics added)

The rulings in these cases may be summed up in this manner:

(1) The mere filing of an affidavit does not oust the judge from the cause.

(2) The judge has the right to determine the legal sufficiency of the affidavit.

(3) The bias or prejudice must be personal, i.e., antagonism or opposition to the litigant, or favoritism for his opponent.

(4) Definite views on the law, adverse rulings in the case on trial, or adverse rulings against the suitor in other cases or in cases involving similar facts do not constitute such disqualification, *even in a criminal prosecution.*

The sound reason behind the rules which these cases lay down is evident. If a judge were not permitted to have definite views of the law, the community might be deprived of the benefit of his accumulated knowledge. Counsel for these very litigants have appeared before me repeatedly for various motion picture companies in cases involving plagiarism. Because of long experience in the field and of my long preoccupation with literary problems, the trial of these cases has saved time and money to the Government which maintains our courts and to the litigants. Yet none of their opponents has sought to object because in written opinions over a long period of years, I have expressed definite views on the law of copyright and plagiarism or because my knowledge of literature may have enabled me to seize quickly similarity and dissimilarity between works of literature. See, Carew v. R. K. O. Pictures, D.C. Cal., 1942, 43 F.Supp. 199; Cain v. Universal Pictures Co., D.C.Cal., 1942, 47 F.Supp. 1013. It is also evident why a judge should not be denied the right to try a lawsuit because he may have, in another proceeding, ruled against a litigant, involving a similar or different set of facts. For, if that were not the case, the determination of one lawsuit would permit the losing litigant to bar forever the judge from entertaining litigation by the same litigants. Because of the large number of districts or divisions in which there is only one or two judges, one can readily envision the dislocation which would occur in the federal judicial system if the law were otherwise.

 If we apply these tests to the affidavit filed in this case, *and assuming, as I must, under the law, that it is true,* it amounts to nothing more than the expression that there was no legal ground for the discharge of certain persons for refusal to answer questions before a Congressional Committee. A judge expressing such a view at a time when *a cause* is pending in a State court, or *even while it is pending in his* court, is not legally disqualified from sitting in an action of this character.

To amplify: The Complaint does not seek damages as to which *there might* be discretion, if the case were tried by the Court. *A jury has been demanded by the defendants. It will decide any questions of fact which may arise in the case.* And the only money judgment which could be rendered, in case judgment is for the plaintiff, is for the salary during suspension. The sole matters left to the judge's determination are questions of law, *as to which any preconceived idea does not and could not disqualify.*

Or, to refer to another example: It is well known to the profession that, for many years before I went on the Bench, I specialized in newspaper law. Since going on the Bench, I have published a book on newspaper libel based on such experience. (Yankwich, Essays on the Law of Libel, 1929), and many articles in law reviews on this and kindred topics (Yankwich, Freedom of the Press in Retrospect and Prospect, 1942, 15 So.Cal. Law Rev. 322). If, on seeing an article, I should express the opinion, on the basis of my knowledge of libel law, that it is libelous, would that disqualify me from presiding in an action brought on it? Clearly not, if I read these cases aright.

## II
### Consequences

The conclusion reached calls for amplification in several respects before announcing the actual decision arrived at.

(A) *Truth of the Allegations:*

As already stated, the truth of the affidavit cannot be adjudicated by the judge involved or anyone else. Berger v. United States, 1920, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; Nations v. United States, 8 Cir., 1926, 14 F.2d 507. Nevertheless, it has been the practice in this court and elsewhere for the judge to state his views for the record in some form. I have also

seen affidavits by judges, both here and elsewhere.

As the matter involves a statement of my own, I shall file with this opinion affidavits of persons present which clearly support the true version of the discussion which took place at the time and place mentioned in the affidavit. I state for the record that the statement attributed to me was not made by me, in whole, in part or in substance, either to Mr. James Ruman or in his presence, or to anyone else. Whatever I said that night was said to a group, after dinner, when several persons were discussing various matters, as is the custom on such occasions. As I had never met Mr. Ruman before, I could not possibly have told him anything in confidence, or outside the hearing of others. As he is not trained in the law, there was no occasion to discuss legal matters. Mr. Ruman, as reported by the affidavit of Mr. E. J. Mannix, is rather "hazy" about the date. He places it "in the latter part of December, 1947, or the early part of January, 1948." *I can supply the exact date.* It was January 24, 1948. As the dates given in the first part of this opinion show, the present action *was not pending* in our court at that time. It was not filed in our court until February 25, 1948. I did not know of the pendency of the action in the Superior Court. The discussion in which I took part was a general discussion about congressional inquiries. Instead of attacking them, I defended them as *necessary instrumentalities of free government.* This, as I have already stated, I believe them to be, despite abuses which serious students of government claim to have crept into their procedure. See, Walter Gellhorn, Report on a Report of the House Committee on Un-American Activities, 1947, 60 Harvard Law Review, 1193. The discussion was participated in by several persons. I cannot understand how the statement I actually made could be interpreted as a "prejudgment" of a controversy not pending before me or be given the construction which Mr. Ruman gives to it.

▉ *While a judge is not to engage in public controversies, he is not required by any code of judicial ethics to padlock his civic conscience and deny himself the right of a freeman to express his views on civic or governmental matters in the privacy of a friend's home.* The defendants and their counsel seem to have been misinformed or deliberately misled by one exhibiting unusual interest in the affairs of others. Perhaps they should have hesitated to act on it, when, *as appears from the affidavit of the Honorable James M. Carter, United States Attorney for this District, they sought but failed to receive confirmation for the alleged conversation communicated to them.* However, I assure them that I harbor no ill feeling towards them because of what was done. Counsel for the defendants gave me an opportunity to avoid the filing of the affidavit. As on a similar occasion in the past, to be referred to presently, I preferred not to do so. I thus followed a precedent of my own, perhaps not known to them. I also felt that this particular litigant could not claim bias or prejudice on my part because many of their cases have been tried in my court and no complaint was heard from them or their present or other counsel, *regardless of how I decided the matters.*

(B) *The Easy and the Hard Way:*

I realize that in choosing not to avoid the publicity which was bound to follow in a case of this character and in choosing now not to disqualify myself, I take a path which *is not* easy. In my twelve and one-half years on this court only one affidavit of prejudice has ever been filed against me. It was filed in a criminal case. I had tried the defendant on another charge. After his conviction by a jury, I imposed a limit penitentiary sentence, because of the gravity of the offense. When the second case in which similar legal questions might arise was filed, I was requested by the Senior Judge of this court to take over the case. I heard several matters in the case. Then counsel in the case, who had not appeared in the other case, informed me that his client felt that I had bias or prejudice against him. *He offered not to file the affidavit if I transferred the case. As in the present case, I insisted that it be filed.* Although the affidavit did not state legal grounds for disqualification any more than the affidavit in this case does, I, nevertheless, withdrew rather than delay the proceedings. Quoting the statement of Pres-

ident Wilson that under certain circumstances one should "be too proud to fight," I stated that "I did not choose to make myself the instrumentality of delay." See, Order, dated December 24, 1945, United States v. Canella, D.C., 63 F.Supp. 377. But the litigant in this case is not a sporadic litigant. It appears often before the federal courts. Some of their cases, involving taxes, copyright, plagiarism, arise directly under the federal laws. In many instances, as in this case, they remove the cause to the federal courts simply because they are a foreign corporation. In this manner, they are entitled to the advantage of a unanimous jury—if the case is tried by a jury—an advantage which the Conference of Judges of the Ninth Circuit has given on several occasions as one of their reasons for advocating the abolition of jurisdiction of federal courts based solely upon diversity of citizenship. Even now, the present defendant has at least two actions pending before me. In Loew's Inc. v. Maurice A. Rapaport et al., No. 7865, on January 15, 1948, I issued a temporary injunction forbidding the defendant the use of the word "Metro" on phonograph records, upon the ground that Metro-Goldwyn-Mayer, the wholly owned subsidiary of the defendant, was known to the public by its shortened name "Metro", and that it being also engaged in the production of records, although under the name "M-G-M," the use of the word "Metro" by the defendant, either to designate his records or the business, was unfair competition and an infringement of the rights of the plaintiff. On February 11, 1948, I entered a final judgment and issued a permanent injunction *which the defendant now claims put him out of business.* There were pending before me on Monday, March 22, 1948, contempt proceedings arising from an alleged violation of the final injunction. As it is our custom to have another judge, not so close to the situation, pass on contempt proceedings arising from a violation of a court order, I requested one of my colleagues to hear the matter. Other proceedings are still possible, which may come before me.

The other case, with different counsel, is Hendry v. Loew's Inc., No. 7744–Y, in which damages for personal injuries are asked. As the Complaint stands now, the amount it is sought to recover is $29,643. On February 4, 1948, at a time when I am supposed to entertain "bias and prejudice" against the defendant Loew's Inc., I sustained their motion to dismiss two of the causes of actions in that case. While the amount involved in them was not large—$1500—the principles which I declared are important to the defendant, for they relate to their obligations arising from the employment of children on their sets. As the plaintiff in that case accepted my ruling, thus establishing a precedent, the opinion which I wrote acquires added significance, not only for the defendant, but to the entire motion picture industry. The case will come before me for setting on April 5, 1948.

How can a litigant claim that I have bias and prejudice against him in one case and not in another? As the bias and prejudice must be personal, it must, *perforce,* relate to an individual or corporation *as an entirety. It cannot be split into segments.* If I am biased and prejudiced against the defendant and the bias and prejudice is of the character recognized by law—that is, as the Supreme Court said in the Berger case, *"a bent of mind that may prevent or impede impartiality of judgment."* Berger v. United States, 1920, 255 U.S. 22, 33, 41 S.Ct. 230, 233, 65 L.Ed. 481. (Italics added) I should be disqualified in all their cases. As they have not attempted to disqualify me in any case except this, am I to allow them to tell me which cases they *wish me to try* and which to *transfer out?* I fear that if this were done, there would be established a dangerous precedent, which would allow a litigant to "go shopping" for a judge. With such a precedent to rely on, persons or corporations involved in much litigation before the federal courts *might* attempt to select the judge whom they wish to try a particular case by making unsubstantial charges or try to cow or intimidate judges by threats of making charges based upon unsubstantiated gossip. *I have too much faith in the integrity, courage and independence of my colleagues on this and other federal trial benches to fear that this would suc-*

880

ceed. *But the very possibility of its being done would breed arrogance in certain litigants; and the independence of the Federal Judiciary would suffer.* The meaning of that independence was stated recently by the Honorable Alexander Wiley, United States Senator from Wisconsin, and Chairman of the Judiciary Committee of the United States Senate in these words; with which I agree:

"An independent Judiciary is a strong Judiciary, a fearless Judiciary, having respect for its co-equal branches of government, but respecting even more its paramount obligation to the American people in interpreting the supreme law of the land". Wiley, The Meaning of an Independent Judiciary, 1948, 7 F.R.D. 553, 556.

(C) *Standing at My Post:*

Of necessity, when a judge declines to disqualify himself, he is, from a purely personal standpoint, placed in a rather uneasy position. No judge can take pleasure in staying in a case when he feels that one of the litigants does not want him. And, ordinarily, the feeling expressed by the Supreme Court applies:

"For of what concern is it to a judge to preside in a particular case; of what concern to other parties to have him so preside?" Berger v. United States, 255 U.S. 22, 35, 41 S.Ct. 230, 233, 65 L.Ed. 481.

This is not only my general feeling, but my feeling in the case. I have no *particular* interest in this case. As I view it, it *does not* even present the type of legal problem in which a judge would be greatly interested or in which his experience or learning might show to advantage. *It is just another lawsuit.* Nor have I any interest in either litigant. I do not know Mr. Cole, the plaintiff and I do not know Mr. Mannix, who filed the affidavit. And Loew's Inc. is, to me, just one of the foreign corporations doing business in California who come or are brought into our courts with their problems at various times. So, *the two litigants here are just two litigants,* among thousands whose causes I have adjudicated in my career on the Bench. *If I felt any bias or prejudice*

against either party, I should withdraw from the case, affidavit or no affidavit. But, having spent twenty-one and one-half years on the Bench of this community, first as a State judge, and then as a United States District Judge, I feel I owe it to the Court and to the community *not to choose* "The easiest way," which would be to deny disqualification, but transfer.the case. There is a much greater duty to stand at one's post than to retreat to "save face." A distinguished District Judge, Merrill Otis, of the Western District of Missouri, confronted with such a situation, wrote:

"Thinking that, I will not voluntarily desert the post at which I have been put. Certainly it will take more to induce me to quit it than affidavits patterned on that well-known modernization of an ancient epigram:

" 'I do not like thee, Dr. Fell, The reason why I cannot tell. But this I know, I know full well, I do not like thee, Dr. Fell.'

"I have heard it said that a judge should fade away like a vanishing dream at the moment he discovers some litigant does not like the color of his hair or the pace of his pulse. If, for example, one indicted as a horse thief is about to be tried for practicing his profession without a license and protests that he desires as his judge one who has not been so indiscreet as to suggest he thinks stealing horses of doubtful morality, the judge should say: 'Why, of course, my dear sir, I yield to your wishes. You shall be the judge as to who shall be your judge. I realize that one prejudiced against horse stealing must be prejudiced against a man charged with stealing horses.'

"Such things have been said, but not by those who think. The father of such a conception of the duty of the judge is the fundamental error that the judge is but a referee at a game, chosen by the players, subject to removal at the will of either. *He is not a referee at a game. He is not the representative of the parties. He is the representative of the sovereign and he will abandon the trust reposed in him only at the sovereeign's command or when he*

*falls at his post."* United States v. Buck, D.C.Mo.1937, 18 F.Supp. 827, 828, 829. (Emphasis added)

Judge Otis has echoed the sentiment, which I have expressed repeatedly, that a law suit is "a means to achieve justice through law—not a game in which the prize is to go to the more skillful." Yankwich, Some of the Social Phases of the Administration of Justice, 1932, 5 S.Cal. Law Review, 189, 207; Yankwich, Concealment or Revealment, 1943, 3 F.R.D. 209; see also, Yankwich, The Judge in Modern American Society, Commercial Law Journal, 1935, Vol. 40, No. 4, pp. 171, et seq.; Yankwich, Judge in a Progressive Society, L.A. Bar Ass'n Bulletin, 1939, Vol. 14, No. 10, pp. 297 et seq. Like him, I must reject an attempt to disqualify which has no legal foundation to support it and which, if successful, is, for the reasons already indicated, fraught with serious dangers for the efficiency and independence of the Federal Judiciary. So doing, I incur the risk of having the defendant feel that, consciously or unconsciously, my action might result in resentment against them or their opponent think that—as lawyers say—I might "lean backwards." But I *must* hazard such speculation. And so I have taken my stand. With God as my witness, I cannot, in good conscience, take another.[1]

---

[1] Attached to the original opinion and filed as Exhibits in open court were six affidavits. They are of no general interest. They are relevant only as corroborating the version of the conversation given in the opinion. At the suggestion of Judge Yankwich, they are not printed.