**UNITED STATES of America,**
**Plaintiff,**

v.

**Ronald James NEHAS, Defendant.**

**Crim. A. No. 73–117.**

United States District Court,
W. D. Pennsylvania.

Dec. 28, 1973.

Richard L. Thornburgh, U. S. Atty., for plaintiff.

Michael P. Malakoff, Berger & Kapetan, Pittsburgh, Pa., for defendant.

## OPINION

DUMBAULD, District Judge.

A defendant charged with failure to undergo a psychiatric examination directed by his draft board in violation of 50 U.S.C. App. 462(a) has timely filed an affidavit of bias, duly certified by counsel, under 28 U.S.C. 144.[1] That section provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Not having attained, as has our long-time friend the illustrious Judge Charles Wyzanski of Massachusetts, unto the beatific status of senior judge where he is free to specify what types of litigation merit his personal attention and what types can be adequately handled by colleagues less endowed with genius, we are constrained to accept and dispose of whatever cases are assigned in rotation by the Clerk's office, unless a specific ground of disqualification exists. Recusation is not warranted merely because I might prefer to be trying some other type of case, or merely because the defendant might prefer that some other judge try his case. Under the individual calendar system now in force in this Court, once chance has resulted in assignment of a case to me, I am "stuck with it" and precluded by my duty to my colleagues and the Court as an institution from failing to persevere unto the end in handling and disposing

[1]. The leading case of Rapp v. van Dusen, 350 F.2d 806 (C.A.3, 1965), arose under another statutory provision, 28 U.S.C. 455.

of it, unless a valid ground of disqualification is demonstrated.

■ In accordance with the language of the statute, and cases construing it, the following procedure is to be observed. The filing of the affidavit does not itself automatically effect the ouster. Instead the legal sufficiency of the facts alleged (as distinguished from conclusionary assertions) must be passed upon by the target judge. He accepts as true the facts alleged, as on a common law demurrer, and determines merely their legal adequacy. He does not determine the truth of the allegations.[2] In fact no one ever passes upon the truthfulness of the allegations.[3] As stated by Judge Yankwich in Cole v. Loew's Inc., 76 F.Supp. 872, 877 (S.D.Cal.1948), "the truth of the affidavit cannot be adjudicated by the judge involved or anyone else."[4] If the target judge finds them legally sufficient, *then* the disqualification is automatically effected. His determination is an interlocutory ruling reviewable on appeal along with other alleged errors in connection with the trial. Green v. Murphy, 259 F.2d 591, 593–594 (C.A. 3, 1958); Behr v. Mine Safety Appliance Co., 233 F.2d 371, 373 (C.A. 3, 1956); Simmons v. United States, 302 F.2d 71, 75 (C.A. 3, 1962).

■ The statute specifies that "personal" bias is the sole ground of disqualification. This involves antagonism or animosity toward the affiant,[5] or favoritism towards the adverse party. Berger v. United States, 255 U.S. 22, 32, 41 S.Ct. 230, 65 L.Ed. 481 (1921); Cole v. Loew's Inc., 76 F.Supp. 872, 877 (S.D.Cal.1948). Personal bias is to be distinguished from "judicial" bias, and does not include views based upon matters arising during the course of the litigation or upon general attitudes common to the public generally. United States v. Gilboy, 162 F.Supp. 384, 394 (M.D.Pa.1958); Knapp v. Kinsey, 232 F.2d 458, 466 (C.A. 6, 1956); Cole v. Loew's Inc., 76 F.Supp. 872, 877 (S.D. Cal.1948).

■ In particular, views relating to legal questions, even strongly-held views in favor of law-enforcement, do not amount to personal bias. *Knapp, supra,* 232 F.2d at 466; United States v. Valenti, 120 F.Supp. 80, 85–86 (D.N.J. 1954); Baskin v. Brown, 174 F.2d 391, 394 (C.A. 4, 1949); Cole v. Loew's Inc., 76 F.Supp. 872, 876–877 (S.D.Cal.1948).

■ Likewise, the severity of a sentence (within the statutory spectrum) is no indication of personal bias. *Knapp, supra,* 232 F.2d at 466; Calvaresi v. United States, 216 F.2d 891, 900 (C.A. 10, 1954).

■ Applying these principles to the case at bar, it seems clear that the allegations in the affidavit do not amount

2. As in the case of the return on habeas corpus, "The Court will determine whether it is a good or bad reason; but not whether it is a true or false one." Holdsworth, History of English Law, IX (1926), 120.

3. If this procedure were applied to habeas corpus, it would be an ideal situation for inmates. Of course under 28 U.S.C. 144 a prisoner does not get out of jail; a defendant merely comes to trial before a different judge. It may indeed be a case of jumping from the frying pan into the fire.

4. "In other words, the judge is denied that 'day in court' to whose provision for others he owes his very office." United States v. Parker, 23 F.Supp. 880, 882–883 (D.N.J. 1938). This "peculiar" statutory provision is characterized as an abuse and subjected to strictures by Judge William Clark. The same critic in United States v. Flegenheimer, 14 F.Supp. 584, 590 (D.N.J.1935), pointed out the "ridiculous" situation in the leading case of Berger v. United States, 255 U.S. 22, 36, 39–40, 41 S.Ct. 230, 65 L.Ed. 481 (1921), where "the affidavit quoted a trial judge as saying something in open court which the actual transcript of the proceedings showed he had not said at all. Nevertheless, the Supreme Court felt constrained (with dissent) to disqualify the judge."

5. In that connection, lack of personal acquaintance with the affiant may be a significant circumstance negating existence of personal bias. Allen v. Dupont, 75 F.Supp. 546, 548 (D.Del.1948). In the case at bar the affiant is quite unknown to the Court except as one name on the criminal docket, just the same as any other defendant.

to a sufficient description of personal bias. At most, nothing but "judicial bias" or zeal for enforcement of enacted law and the policies of Congress embodied therein is established. Under the authorities outlined above, this is not enough.

The allegations of the affidavit in substance boil down to two: that in draft cases the Court imposes severe sentences, and is often reversed.

It is true that this Court considers violation of the draft laws to be a serious offense (contrary to the views of the head of the parole board, as stated in a recent interview in the New York Times).

■ The constitutionally conferred power "To raise and support Armies" [Art. I, sec. 8, cl. 12] and cognate powers, commonly referred to collectively as the war powers, are indisputably vital to national defense and national survival. Compulsory service is an integral part of the war powers. Selective Draft Law Cases, 245 U.S. 366, 377, 38 S.Ct. 159, 62 L.Ed. 349 (1918); Cox v. Wood, 247 U.S. 3, 6, 38 S.Ct. 421, 62 L.Ed. 947 (1918).

Eminent and respectable authorities have declared that in time of emergency even constitutional rights may be sacrificed for compelling national purposes of vital importance.

In the words of Thomas Jefferson: "A strict observance of the written laws is doubtless *one* of the high duties of a good citizen, but it is not *the highest*. The laws of necessity, of self-preservation, of saving our country when in danger are of higher obligation. To lose our country by a scrupulous adherence to written law would be to lose the law itself, with life, liberty, property, and all those who are enjoying them with us, thus absurdly sacrificing the end to the means."[6]

Likewise, Abraham Lincoln thought it folly, for the sake of one particular provision of the Constitution [he was referring to suspension of habeas corpus], to refrain from measures to restrain those who were attempting to "destroy Union, Constitution and law, all together."[7]

And Robert H. Jackson in Korematsu v. United States, 323 U.S. 214, 244, 65 S.Ct. 193, 89 L.Ed. 194 (1944) said: "The armed services must protect a society, not merely its Constitution."

If the measures of Congress to provide for protection of the nation could be nullified by a universal unwillingness to serve in the armed forces, the consequences would be disastrous and intolerable. Fortunately, there has not occurred a 100% simultaneous refusal to serve on the part of all draftees. But the efforts of Congress to deter refusal by imposing criminal sanctions must not be frustrated by reluctance on the part of "soft-hearted" judges[8] to carry out the policies of Congress.

■ As stated in the ancient maxim of Lord Coke, let no man consider himself wiser than the law. The law itself makes provision for *bona fide* conscientious objectors; but mere political dissent from government policies does not constitute an excuse for escaping from the performance of legal duties, including those relating to armed service when duly called upon to defend the nation.

---

6. [Italics in the original]. Dumbauld, The Political Writings of Thomas Jefferson (1955) 144–45. This doctrine is not to be invoked routinely, but only "on great occasions, when the safety of the nation or some of its high interests are at stake." *Id.* The Louisiana Purchase (which he thought unconstitutional) was deemed by Jefferson to be such an occasion.

7. To Erastus Corning and others, June 12, 1863. Arthur B. Lapsley (ed.), The Writings of Abraham Lincoln (1906) VI, 314; message of July 4, 1861, ibid., V, 327. See also Holdsworth, History of English Law, VI (1927), 32–40.

8. I prefer this description rather than President Nixon's appellation "soft-headed." Office of the White House Press Secretary, Address by the President, March 10, 1973 (mimeographed) p. 3: "The time has come for soft-headed judges and probation officers to show as much concern for the rights of innocent victims of crime as they do for the rights of convicted criminals."

Violations of the draft laws are not only serious because of their detrimental impact upon the national interest, but also because (like counterfeiting,[9] and perhaps to a lesser extent, rape [10]) they are deliberate and premeditated offenses. By the same token, one never observes in the case of draft offenders any manifestation of remorse, regret, change of heart, or other harbingers of reformation which constitute a ground for leniency in other types of offense.

Another significant characteristic of draft cases is that there is little substantial dispute as to facts. (Occasionally there may be a contention that certain correspondence miscarried in the mails.) But there is never any doubt regarding the non-performance of the service in the armed forces (although on occasion I have required the Government to call as a witness the officer at the Induction Center across the street, rather than rely upon hearsay evidence in the form of a list routinely submitted in the ordinary course of business.) The only defense usually offered is some alleged procedural vice resulting in the invalidity of the draft board's order. (Such a defense, when duly established, is of course very effective; in one case I acquitted one of Mr. Malakoff's clients because the Government failed to submit proper proof that the defendant had been classified I–A). Professor Zechariah Chafee has remarked that social reformers and pioneers in political thought (such as Socrates) when embroiled with the law usually rely on technical defenses. It is only natural that this should often prove to be true in draft cases, where the defendants are often antiestablishmentarian nonconformists.

 If, then, draft cases are serious, and not merely youthful peccadilloes (like Yale students stealing a street car to celebrate a football victory), the punishment should accordingly be proportioned to the crime.[11]

Concerning sentencing practice in this Court, the following description which I recently had occasion to write in another connection is applicable to draft violation cases:

"Let me begin by an explanation of the sentencing procedure which I uniformly follow. The first point is, that like all judges so far as I know, I take great pride in the fact that I make a conscientious and careful examination of the facts and circumstances in every individual case on its own merits.

"With negligible exceptions (such as the mandatory sentences in certain narcotic cases where the Court has no discretion one way or the other, and the similar flat fifty-dollar penalty in tax stamp cases involving numbers writers, which were numerous before their elimination by the Supreme Court's decision in the Grosso case) I receive in every case, before sentence is imposed a pre-sentence report prepared by the Probation Office.

"The pre-sentence report, in addition to the defendant's and the prosecutor's version of the offense involved, provides information concerning defendant's prior criminal record, his employment or work record, his family background, health, hobbies, religious and civic activities if any, and other information

---

9. Robert H. Jackson, when Assistant General Counsel of the Treasury, said: "Counterfeiting is an offense never committed by accident, nor by ignorance, nor in the heat of passion, nor in extremity of poverty. It is a crime expertly designed, by one who possesses technical skill and lays out substantial sums for equipment."

10. On rape, see Furman v. Georgia, 408 U.S. 238, 458, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) [Powell, J.].

11. The principle of proportionality between crime and punishment has been recognized at least since the time of Beccaria and of Thomas Jefferson's Virginia act on the subject, which failed of passage because of "the rage against horse-stealers." Dumas Malone, Jefferson the Virginian (1948) 269–70; James Madison to Jefferson, February 15, 1787, Papers of Thomas Jefferson (Boyd ed.) XI, 152.

which may be helpful to the Court in forming a clear picture of the individual, his character traits, his stability as a citizen, his roots in the community, his motivations leading to the crime of which he has been convicted or entered a plea of guilty, and his potential for rehabilitation as a useful and productive member of society.

"When the defendant appears for sentence, the Government presents such information as it has concerning the criminal record of the defendant and any comments which it wishes to make. The present policy of the United States Attorney's Office in Pittsburgh is not to make any specific recommendations regarding the sentence, that being a matter for the ultimate determination of the Court. The defendant is publicly advised at the time of sentence as to the maximum punishment which can be imposed, and that the Court is not bound by any promises or recommendations which have been made by anyone to the defendant. Other routine questions are asked to identify the defendant and make sure that he fully understands the nature of the proceedings.

"The defendant's attorney offers any comment or testimony which he feels will be helpful and the defendant himself is called upon to make any statement which he may wish to make to the Court. *I do not make up my mind or reach any decision as to the sentence to be imposed until the conclusion of the above-described proceedings in open court.*[12]

"In each case the Court must determine at what point in the scale or spectrum of legally permissible penalties the particular case for adjudication appropriately falls or belongs. This requires an evaluation of all the facts and circumstances surrounding the particular case."

When making this individual evaluation of each case, certain factors are identical and must be taken into consideration in every case of the same category. These include, of course, the elements of the offense charged, and the penalty provisions of the statute involved.

With regard to the type of offense here involved, and the philosophy of sentencing applicable thereto, the colloquy with Tom Kerr, Esq., in the *Zmuda* case (appended hereto as Appendix A) gives a fuller discussion than is to be found in the other cases listed in defendant's affidavit. Before considering these factors, however, the special situation presented in certain genuine conscientious objector cases should be distinguished. The policy of Congress with regard to all such objectors is that they are to be relieved from the obligation to perform armed service provided they perform other equivalent work of national importance.

It happens to be a fact that some of such objectors, notably Jehovah's Witnesses, seem to be willing to perform such work if so ordered by a Court, but not when ordered by the Draft Board. Apparently they regard the draft board as an appendage or instrumentality of the military and industrial power complex, but regard the court as an independent branch of civil government, civilian rather than military in its nature. (Personally I do not see why any one particular agency of the secular state is less than any other an instrumentality of the powers of darkness when contrasted with the divinely ordained Church; but it is, not my reason or conscience which controls the conduct of these defendants, and they in fact do draw this distinction).

In such situations therefore, where indictment and conviction are merely for-

12. Italics supplied. Thus the vice of imposing pre-determined penalties, without appropriate individualized judicial consideration of each particular case, which was condemned in United States v. Thompson, 483 F.2d 527 (C.A.3, 1973) upon which defendant relies, is not present in this Court's practice. [Issues arising out of the *Thompson* case are now pending before the *Supreme* Court *sub nomine* Luongo v. Court of Appeal.]

malities necessary to vest the Court with jurisdiction to make an order to perform work of national importance which the defendants find to be acceptable and consonant to the dictates of their conscience, I normally concur with the program of the Department of Justice to handle such cases in such fashion that the order to perform such work constitutes the basic feature of the probation upon which the defendants are placed when their cases are disposed of in accordance with this procedure.

▮ Returning now to the run-of-mine draft violator, we come to appraisal of the customary factors which penologists have described, particularly retribution, rehabilitation, prevention, and deterrence. Ordinarily (and especially in the case of genuine conscientious objectors) this type of defendant has no prior criminal record with respect to other types of offenses (there could be bomb-throwers and other types of protesters numbered in this category, but in practice I do not recall having had any such cases) and rehabilitation or preventive incarceration to forestall recidivism is not a significant factor.

Deterrence, as indicated above, is the main factor to be taken into account. In order to effectuate the Congressional purpose of exercising the war power by providing for induction of citizens into the armed forces, it is essential to ensure that the lot of one who chooses to evade his civic and legal obligation to serve is not more pleasant, favorable, and advantageous than the lot of one who chooses to perform his obligation.

The patriotic youth who responds to the call of his country and complies with the laws enacted by Congress must at the risk of his life and limb give up certain rights and liberties for a period of two years.[13]

Roughly speaking, the restrictions on personal freedoms and liberties resulting from imprisonment may be regarded as substantially equivalent to those flowing from service in the armed forces. Therefore incarceration for two years will produce a substantial measure of equality between those who obey and those who flout the law. Anything less would constitute preference for the criminal and discrimination against the law-abiding patriotic citizen. Anything over two years will intensify and increment the deterrent force of the sentence.

▮ In order to ensure imprisonment for two years, the sentence must normally be three times that much, since parole is often granted [pursuant to 18 U.S.C. 4208(a)] at the end of one-third of the term imposed by the Court (especially since the head of the Parole Board, as stated in the New York Times, does not consider this offense to be serious). Five years, however, is the maximum under the applicable statute; and some leeway must be allowed in order to adjust the particular case to its proper place in the range or spectrum of permissible penalties. A defendant who diligently complies with all procedural formalities and whose violation merely consists in the ultimate refusal to take the one step forward at the induction center deserves more lenient treatment than one who fails to register, or to keep his draft board informed of his address, or who flees or hides in order to escape apprehension, or berates the board with foul language and disrespectful pronunciamentos.

When all the foregoing factors are duly evaluated at the time careful consideration is conscientiously given at the time of sentence to the particular circumstances of each individual case, it is not surprising that statistical data

---

13. We are dealing with the law applicable at the time the case at bar arose. Subsequent resort to a volunteer system, after proclamation of "peace" with "honor" in Vietnam, furnishes no excuse for those who failed to perform duties existing at the time of their non-feasance. Speaking of honor, when Elliot Richardson resigned as Attorney General, I thought of the utterance of Justice Holmes that "the power of honor to bind men's lives" is no less today than it was in olden times. Occasional Speeches (Howe ed. 1962) 32.

might show a certain clustering of the results reached; just as a cook carefully watching the progress of an omelette in the frying pan, after putting in the proper quantity of eggs and other ingredients for each omelette, might be found, if timed by a stop-watch, to have judged several successive omelettes ready to be served in approximately the same number of minutes of cooking, even though he did not watch the clock but watched the skillet during the performance of the cooking process, and exercised discretion and judgment, and did not follow rote or formula, in determining when the proper time had come, in each case, to serve the perfected delicacy.

Accepting to the full extent of its logical consequences the judicial philosophizing candidly and completely avowed in the foregoing discussion, we are constrained to conclude that it does not amount to "personal bias" against the affiant defendant. At most it constitutes permissible "judicial bias" or strongly held views in favor of law enforcement, or the imposition of severe but lawful sentences, which under *Knapp* and other cases cited *supra* do not amount to "personal bias" under 28 U.S.C. 144.

Coming then to affiant's second point, that this Court's decisions in draft cases are often reversed, it is clear that this circumstance also fails to demonstrate the existence of any "personal bias" under 28 U.S.C. 144.

If any personal bias at all could be derived from such a circumstance, it would surely be bias against the appellate court judges involved in such reversals, not bias "against him" [the defendant] as required by the statute!

■ But in truth reversals constitute no ground for bias or ill-will against any one. Reversals are a normal incident ancillary to the appellate process; and it is a settled principle of our system of jurisprudence that every litigant is entitled to at least one appeal as of right.[14] Appellate courts would be a useless fifth wheel if they merely served as a rubber stamp automatically affirming the court of first instance. The ripe reflection, research, and review contemplated by the appellate process inevitably generates reversals. Trial courts must rule on many difficult points *instanter* and off the cuff, or shooting from the hip, to vary the figure of speech. Moreover, as stated by a judge now prominent in the public eye, "Any judge who has his eye on the court of appeals and whether he is going to be reversed or not can't be a good judge."[15]

A further refinement with respect to the function of appellate courts deserves consideration. This was elaborated by Judge Shirley Hufstedler,[16] who drew attention to the fact that appellate courts perform two separate tasks: (1) supervising the application of well-known and established rules of law (such as whether there was enough evidence to go to the jury, or whether a particular exhibit was properly admitted or excluded); and (2) the development of the law as an integral and symmetrical corpus, by adopting innovations harmonious with the body of law as a whole.

Judge Hufstedler's proposal, when combined with suggestions proposed by Judge Louis Rosenberg, points to a possible means of expediting disposition of the caseload of appellate courts. Under the Hufstedler-Rosenberg plan, the panel of the Court of Appeals handling a case involving only the first function might well consist entirely of District Judges, with extensive trial experience and coming from another District than that in

---

14. The burden upon the judicial system was lightened by establishing the Circuit Courts of Appeal in 1891, and in 1925 by making further appeal (to the Supreme Court) discretionary rather than as of right. Frankfurter and Landis, The Business of the Supreme Court (1927) 101, 262, 280.

15. As quoted in Howard Muson, "A Man for This Season", New York Times Magazine, Nov. 4, 1973.

16. See discussion in Friendly, Federal Jurisdiction: A General View (1973) 42–43.

which the case was tried. This would liberate the Circuit Judges for the performance of the second (and most important) function.

Now it happens to be true that the second function (of formulating innovations and the development of new law) has proceeded perhaps more extensively in the field of draft cases than in any other branch of the law. Hence it is no cause for surprise or concern if District Court decisions are often reversed because of the rendition of intervening decisions of the Supreme Court or of the Court of Appeals itself.[17]

▉▉▉▉▉ This Court firmly adheres to the view that new law should be made by appellate courts, not by the trial courts.[18] And much new law is being constantly elaborated regarding the Selective Service Act. Some such innovations are very persuasive and reasonable;[19] others appear to be a grotesque *tour de force,* such as the judicial establishment of a new religion, with Tom Clark as its Prophet.[20]

This feat merits comparison with the achievement of Parliament in its 1870 legislation regarding religious teaching in state schools. Concerning this accomplishment Professor Gilbert Murray says:

There were two or three possible views which might claim to be logical. If Parliament knew what religious doctrine was true, it should have that doctrine taught in the schools . . . If Parliament did not know what religion was true, it could either abstain from religious teaching altogether . . . or it could allow all sects . . . to inculcate their particular preferences. Parliament did none of these things. It accepted a motion from a private member, Mr. Cowper Temple, authorizing the teaching of Christianity, but ordaining that "no religious catechism or religious formulary distinctive of any particular denomination shall be taught in the schools." Disraeli . . . riddled the clause with hostile criticism. It was unintelligible; *it founded, on the spur of the moment, a new religion*; it made the teachers into a new sacerdotal class. Yet, as a matter of fact, the clause expressed the real fundamental wish of the best minds of the nineteenth century, it stood the test of experience, it enabled religious teaching to move as men's aspirations moved, and it did in a rough-and-ready way separate the kernel of religion from the husk of dogmatic theology. Established religions do not cut a very distinguished figure in the history of human thought, but that unconsciously created by Mr. Cowper Temple is perhaps, for practical purposes, about the best there has ever been.[21]

17. Thus one phase of *Zmuda, supra,* where sentence was imposed on March 20, 1969, was reversed in reliance on Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532, decided on January 19, 1970. 423 F.2d at 758.

18. Negrich v. Hohn, 246 F.Supp. 173, 179 (W.D.Pa.1965) ; Lovelace v. Leechburg School District, 310 F.Supp. 579, 585–86 (W.D.Pa.1970).

19. Such as Oestereich v. Selective Service Board, 393 U.S. 233, 237, 89 S.Ct. 414, 21 L. Ed.2d 402 (1968) [mandatory statutory exemption not revocable upon unrelated grounds] ; Scott v. Commanding Officer, 431 F.2d 1132, 1136–1137 (C.A.3, 1970) [board must state reasons]. Prior to *Scott* we took the view that no statement of reasons was required. We regard draft boards as a group of public-spirited patriotic citizens, without legal training, who are performing without pay an important public service. They should not be subjected to any vexatious or burdensome requirements except to the extent necessary to ensure substantial justice and fairness. They should not be expected to issue elaborate opinions comparable to those of a judicial tribunal or of counsel to a corporate executive walking on eggs to achieve compliance with the requirements of the Antitrust Laws.

20. United States v. Seeger, 380 U.S. 163, 166, 173–185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

21. [Italics supplied.] Gilbert Murray, The Ordeal of this Generation (1929) 47–48, quoted in Dumbauld, Life and Legal Writings of Hugo Grotius (1969) 119.

So the list of reversals stressed by defendant fails to persuade us of the existence of any "personal bias" against the affiant.[22]

Both branches of the affidavit being insufficient to establish "personal bias" as required by 28 U.S.C. 144, we are constrained to reject the motion.

■ It remains only to state *per cautelam* that no peril to defendant is possible by reason of any ill-will *against defendant's counsel* by reason of filing the motion to recuse. The statute does not cover that contingency, but fairness to the parties requires that it be dealt with. This Court is firmly of the view that it is the duty of counsel to resort to every proper procedure which he thinks may be helpful or advantageous to the cause of his client (including motions under 28 U.S.C. 144) and no judge should entertain any resentment at being made the target of such a proceeding (although upon perusal of some of the opinions cited *supra* one gains the impression that some of the judges involved had bristling hackles, if that is the right expression).

The fact is that the Court holds defense counsel in the highest esteem and respect. Indeed, of all the lawyers appearing in this field of practice, there is no one upon whose statements and knowledge concerning the contents and history of the complex and involuted regulations dealing with Selective Service matters the Court would more confidently rely (although of course his conclusions therefrom *arguendo* have not always been followed by the Court). A very capable presentation of the defendant's case is anticipated, and will receive the most attentive consideration.

### APPENDIX A

Excerpt from transcript in United States v. Zmuda, Cr. No. 68–283 [aff'd in part, 423 F.2d 757, 758–59 (1970)]

pp. 4–6, 15–17. [Material in brackets supplied to correct omissions of reporter.]

MR. KERR: Your Honor, I have submitted a memorandum concerning sentencing to your Honor, as well as to the United States Attorney. I have very little to add to that. I mentioned in that, that the purpose of sentencing is often rehabilitation, or to remove from society someone who may be destructive to society. I think these elements of sentencing, to incarcerate, are not present here. It seems to me that there is one other point on sentencing with respect to imprisonment that I should have mentioned; that is the matter of whether or not punishment is applicable in the situation, and with respect to that, I would urgently like to suggest to your Honor, and to all judges who bear the responsibility that you must bear—it is a difficult one—to read the new book by Dr. Karl Menninger, called the Crime of Punishment.

THE COURT: I haven't read it. [I have heard of it.]

MR. KERR: What happens to people in our society due to, not failure of the judge, but due to some failures of the prison system; what happens to some people who are in prison.

Briefly, we have asked in our memorandum that this 19-year old young man who is not a destructive person, is not a person who is going to harm any other individual, be given the opportunity of serving alternative service under probation of the court.

MR. SCHUMACHER: The government hasn't filed a reply brief, your Honor, but I'd like to briefly comment on some of the points raised, with the permission of the court.

THE COURT: I first ask Mr. Kerr, I know of no authority that actually excludes the retributive—what do you call it—philosophy.

---

**22.** A quick superficial count shows a batting average of 67 affirmances and 62 reversals in all appealed cases to date since appointment. Comparing these figures with defendant's, must we assume the existence of "personal bias" with respect to *all categories of litigants* involved in *every* type of litigation?

MR. KERR: No, your Honor, we recognize that legally here this morning this is entirely a matter which is in your jurisdiction.

THE COURT: Of course you are familiar with all the various theories, from Beccaria and the Gluecks and so on; actually I think that is more or less philosophical and as a court we have to follow a more pragmatic view.

If I might say, in my view the statute says primarily, expressing the policy of Congress and their policy of the law, that they define a range of maximum and minimum which is like the zone of reasonableness in railroad rates; the rate could be so many cents per hundred pounds or otherwise, and there is a range, and therefore in that respect that general rule would apply to this type of case as well as others, but I look at the maximum as being a violation of a code with the most deliberate premeditated intentions of a professional criminal; if a bank robbery is accompanied by actual killing or violence that would be up at the top, whereas if somebody sells a jug of good quality moonshine at a reasonable price we are dealing at the other end of the scale, so that in any case the object of the court is to place the particular defendant in the proper place of the spectrum as prescribed by the statute.

MR. KERR: If I may take the liberty of saying it, I think your Honor is applying some philosophy there; I think philosophy is appropriate. I think the most important point in the nature of the case that we have here today is the youth of the people who are involved.

THE COURT: Well I might also, in philosophizing, which may give additional ground for error, but nevertheless I think I should state, in candor, I should submit my view that while we are applying the statute or policies enacted by Congress, that also, the court has [to enforce a] clear command of the federal government which is established by the tional powers of Congress and the provi-Constitution, must respect the constitusions of the Constitution itself, and that therefore as far as the court is concerned we must accept the war powers as being just as valid as the First Amendment to the Constitution, and that the legislation in the area of national defense is expressive of the public policy of the United States, and that [it must] be accepted and carried out by the courts, and in the exercise of their constitutional and the legal functioning, and the court, I must consider patriotism as a laudable and virtuous state of mind, and not as obsolete or old fashioned, and that I must also consider the comparison or relationship of those who seek to evade or avoid service with those who do render it.

I am compelled to conclude that those who do serve their country in the armed forces are performing praiseworthy and laudable actions, and that we must consider them as deserving the praise and respect of the nation whom they are serving, and accordingly we must recognize that they do and in fact are exercising a type of activity which deprives them of their customary freedom of choice, and of activity, and that they are subjected to a diminution of their liberty, they are also subjected to hardships, perils, and dangers. Consequently the status and the state and condition of somebody who withdraws from the System ought not to be a more advantageous one than the person who accepts the responsibility of citizenship, and to make sure that this is the case, the defendant in a case such as this, in my judgment should also be subjected to diminution of liberty and hardships and hazards and perils; and just as in the case of an income tax violation where the object is profit, I think the defendant should also be fined at least twice the amount of the sum that he has defrauded the government of, so here I think in order to make sure the status of those who avoid service is not more advantageous than those who submit to it, the penalty of the one who violates it should be at least twice as much as that of those who serve; so therefore, if we consider the hardships and deprivations of liberty connected with incarceration

as the equivalent of those [which men] in the armed services are subjected to, and we come out with the result that the standard sentence which I have always hitherto imposed in this [type of] case is a sentence of four years imprisonment.

In this case it appears that the defendant deliberately failed to exhaust his remedies under the Selective Service System; he did write these comments in bad taste to the secretary, and in fact I really think that probably five years would be justified in this case, but I will follow the usual custom and therefore it is the sentence and judgment of the court that the defendant pay the costs of prosecution and be committed to the custody of the Attorney General of the United States or his duly authorized deputies, for confinement in a penal type institution for a period of four years.