UNITED STATES of America, Plaintiff,

v.

Joseph CONFORTE and Sally
Conforte, Defendants.

No. CR 77–00024 BRT.

United States District Court,
D. Nevada.

Aug. 4, 1978.

Leland E. Lutfy, Asst. U. S. Atty., Reno, Nev., for plaintiff.

Bruce I. Hochman and Harvey D. Tack, Hochman, Salkin & DeRoy, a Professional Corp., Beverly Hills, Cal., Stanley H. Brown, James Belford Brown, Stanley H. Brown, Chartered, Reno, Nev., for defendant Joseph Conforte.

Oscar B. Goodman, Goodman, Oshins, Brown & Singer, Chartered, Las Vegas, Nev., for defendant Sally Conforte.

## MEMORANDUM OPINION

FERGUSON, District Judge.

Following a bench trial before Judge Bruce R. Thompson, the defendants were convicted and sentenced on four out of ten counts of an indictment charging them with violations of the federal tax laws. After filing notices of appeal, the defendants presented motions for a new trial on the ground that newly discovered evidence indicated that Judge Thompson had been personally biased and prejudiced against them at the time of their trial. The Court of Appeals for the Ninth Circuit remanded the case to permit consideration of the motions and assigned the undersigned to the District of Nevada for that purpose. An evidentiary hearing was conducted in order to resolve the factual issues presented. Having carefully considered the evidence produced at the hearing, as well as the briefs and oral argument of counsel, I conclude that the motions for new trial must be denied as to both defendants.[1]

I

A. Factual Background.

Joseph Conforte is the owner of a house of prostitution known as the Mustang Ranch in Storey County, near Reno, Nevada. The present case does not represent his first experience with the criminal justice system:

1. In 1960, he was convicted of extortion by a Nevada state court and was sentenced to state prison.

2. Shortly after that conviction, he pled guilty to a federal income tax violation charge in the District of Nevada and was sentenced by Judge William Mathes to federal prison. While serving his sentence, Conforte made a motion to withdraw his plea of guilty to the federal charge. That motion was heard by Judge Thompson and was denied. The defendant was subsequently released from McNeil Island federal prison in 1965.

3. In 1968, Conforte was indicted and tried before Judge Thompson for a violation of the Mann Act, 18 U.S.C. § 2421 et seq. At the conclusion of the government's case, Judge Thompson granted a motion for judgment of acquittal.

---

1. The defendants, Joseph and Sally Conforte, are husband and wife. Although Mrs. Conforte joined in her husband's motion for a new trial, the discussion which follows pertains primarily to Mr. Conforte. There is no evidence whatsoever that Judge Thompson had any preconceived personal opinion about or bias against Mrs. Conforte.

4. In 1970, the Internal Revenue Service filed a civil complaint for condemnation and forfeiture of certain trailer houses used by Conforte in his prostitution business. Again, the matter was heard by Judge Thompson, who decided the case in Conforte's favor.

Apart from his appearances in court, the defendant has had only very limited personal contact with Judge Thompson. Both Conforte and Judge Thompson are avid bridge players, and on approximately 25 occasions they have played in the same tournaments, although never as partners. On each such occasion they said "hello" to each other, and at one tournament they spoke briefly about politics.

Conforte and Judge Thompson also recall having met outside the courtroom at three other times. The first was shortly after Judge Thompson had acquitted the defendant of the Mann Act charge. They both attended a play at the Reno Little Theatre, where Mr. Conforte introduced his daughter to the judge during an intermission. The second time was at a charitable event for which Mr. Conforte had donated two or three mink coats to be auctioned. The two talked briefly on that occasion. Their third meeting was in a men's clothing store, and again they spoke only briefly. Mr. Conforte describes Judge Thompson as having been "very cordial, very friendly" on each of these occasions.

### B. The Present Case.

In the fall of 1977, a ten count indictment was filed against the Confortes charging them with violations of 26 U.S.C. § 7201, the willful attempt to evade and defeat withholding taxes due the United States. Prior to trial, the government and the defendants appeared before Judge Thompson for the purpose of entering a waiver of the right to a jury trial. A transcript of those proceedings is set out in the margin.[2] Be-

---

**2.** MR. BROWN: If your Honor please, I represent Mr. Conforte in association with Mr. Hochman of Los Angeles, who has been previously admitted, and he is not here today, but Mr. Harvey Tack from his office is, who has not been admitted, and I will file the necessary papers.

Mrs. Conforte is represented by Mr. Maxwell and also Mr. Claiborne.

We have considered the matter of trial by jury, and we have been considering it for some time, and if your Honor please, we wish to move the Court at this time to consider our request that a jury be waived in this matter, and that all issues of fact be tried by the Court.

MR. PIKE: The Government has no objections to such a waiver, your Honor, and will join in it.

THE COURT: Mr. and Mrs. Conforte, you have been advised, I am sure, that you have a right to a jury trial. A jury would be composed of twelve citizens drawn at random from the registered voter list of this community. The jury would have to be persuaded beyond a reasonable doubt of your guilt of one or more of the charges contained in the indictment before they could find you guilty.

Their decision would have to be unanimous, and they would all have to agree.

If you waive a jury trial, the question of your guilt or innocence would be left solely to me as the judge presiding over the trial. Of course, my decision would also have to be unanimous, because there is only one of me.

I would also have to be persuaded by the evidence beyond a reasonable doubt of your guilt before I could find you guilty.

Do you understand what I have said?

MR. CONFORTE: Yes.

MRS. CONFORTE: Yes.

THE COURT: Do you desire to waive a jury trial, Mr. Conforte?

MR. CONFORTE: Yes, sir.

THE COURT: Do you, Mrs. Conforte?

MRS. CONFORTE: Yes, sir.

THE COURT: *There is something else involved in this waiver of jury trial that should be brought out in the open. I am aware of Mr. Conforte's criminal record. Some years ago I passed upon a post-conviction remedy motion that was filed on behalf of Mr. Conforte. I am aware of two trials in this court which involved Mr. Conforte, one in which I believe he was charged with a violation of the White Slave Traffic Act, and another which involved an effort to abate the operation of the so-called Mustang Ranch for Internal Revenue violations.*

*Facts of that nature, if known to a juror prior to impanelment of the jury, would be a basis for disqualification of a juror. If I am going to be the trier of the facts in this case, I can't eliminate the knowledge I already have. So I want you to know—and you know what I know—that if I am going to preside over this trial without a jury, you will have to waive any basis of disqualification because of my prior knowledge of facts concerning Mr. Conforte primarily; I don't know much about Mrs. Conforte.*

fore the jury waiver was accepted by the court, Judge Thompson advised the defendants that he had knowledge of facts about Mr. Conforte, based upon the defendant's prior court cases, which would constitute grounds for disqualification if he were a juror. The defendants then specifically waived any objection to Judge Thompson's qualification to sit as the trier of fact despite his prior knowledge regarding Mr. Conforte.

The case proceeded to trial before Judge Thompson. Following the presentation of evidence by the prosecution and the defense, the Confortes were acquitted by the judge on the first six counts of the indictment pertaining to the filing of false quarterly returns. However, they were found guilty on the remaining four counts of evasion of withholding taxes. Mr. Conforte was sentenced to 5 years in prison on each count, the terms to run consecutively for a total of 20 years. In addition, he was fined $10,000 on each count, for a total of $40,000. Mrs. Conforte was sentenced to concurrent prison terms of 4 years on each of the four counts; however, execution of the sentence was suspended, and she was placed on probation. She was also fined $10,000 on each count.

At the time of sentencing Judge Thompson commented extensively regarding his reasons for imposing sentences which he recognized to be particularly severe. The relevant portions of his remarks are printed in full in the margin.[3] The judge explained

*Do you understand what I have told you?* (emphasis added)

MR. CONFORTE: Yes, sir.

MRS. CONFORTE: Yes, sir.

THE COURT: Do you agree that I am not disqualified to try the case?

MR. CONFORTE: I agree, sir.

THE COURT: Do you, Mrs. Conforte?

MRS. CONFORTE: Yes.

THE COURT: Mr. Maxwell, is this proposed waiver of a jury trial with your approval and after full conferences and explanations with your client?

MR. MAXWELL: It is, your Honor.

THE COURT: Is that true of you, also, Mr. Brown?

MR. BROWN: Yes. We have discussed it for days, your Honor.

THE COURT: The waiver will have to be signed in open court. Do you have one available?

Is there any other information I should discuss with the defendants, Mr. Pike, according to your—

MR. PIKE: Not that I am aware of, your Honor. (Pause.)

THE COURT: Each defendant has signed a waiver of jury trial and a waiver of special findings of fact, which has been approved by each defendant's attorney and by the United States Attorney. It will be approved by the Court.

3. THE COURT: I want to ask Mr. Hochman a question, as he is a tax specialist and is present here today.

Although Mr. Maxwell is the person who advised the defendants with respect to the form of their income tax returns, which had been referred not only in the trial but by Mr. Conforte in his plea to the Court: Is it your contention, Mr. Hochman, or if you do not wish to answer that question, is it your understanding of Mr. Clyde Maxwell's position and professional advice that a person in the position of these defendants, taxpayers in the position of these defendants, have a right to, a constitutional right to file the types of returns which they filed in which they just arbitrarily set forth a figure which they concede they owe the Government, without any supporting data to show how the computation was made?

MR. HOCHMAN: He passionately believes that, your Honor, and predicates it on some Supreme Court cases.

THE COURT: I know the cases he referred to, which are referred to in the returns, the addenda to the returns that have been filed. They are cited.

Now, *the sentences that I am about to impose are going to be framed that because I think that position is 100 percent wrong.* I think you have no constitutional right in operating a legal business to refuse to disclose the details of your operations to the Internal Revenue Service for the purpose of a correct computation of income tax returns. I think that the cases cited upon which counsel relies have been misinterpreted and misapplied. I don't think that Mr. and Mrs. Conforte, simply because they are operating a type of business which deals primarily in cash and which lends itself to concealment of income and expenses, are permitted to evade the Internal Revenue laws of the United States by filing a return in which they in effect say that they cannot or will not disclose their true income and expenses because of a specious claim that it would tend to incriminate them.

The only possible incrimination they could incur, as I see it, or the basic possible incrimination would be incrimination for filing false and fraudulent tax returns if they didn't attempt in any respect to comply with the Internal Revenue laws.

that he was especially concerned about the fact that, in at least one of the tax years in question, the defendants had filed "Sullivan" tax returns. In such returns, named

after the decision in *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), the taxpayer declares only his net income and tax due based upon his own

Now, I recognize that these offenses with which these defendants have been convicted are not offenses for willful attempts to defeat and evade income taxes due, but I think that I do have the right in imposing sentence to take that information, which is uncontradicted, not only in the record during the trial but in the record before me in connection with the presentence report, in formulating a just and proper sentence in this case. It is my intention to do it so that we can find out, I hope definitively, whether taxpayers in the position of these two defendants have a right so to conceal their true taxable income from the Internal Revenue Service. I am going to do it by imposing certain conditions on one sentence and formulating the other sentence in a way so it will be 100 percent clear that if you do have a constitutional right to do that a portion of my sentence is going to be illegal.

I do want to say one other thing, which counsel will be in a position to explain to their clients. It may appear to counsel and to the defendants that the sentences I am about to impose are unduly harsh and severe, but I do it with full knowledge that under the Rules of Criminal Procedure that at an appropriate time I will have the power and authority to modify or reduce those sentences. But I do think it is important that we find out in the administration of the tax laws of this country whether this type of position can properly be taken by taxpayers in the United States.

Sally Conforte, will you please rise.

It is the judgment and sentence of the Court that with respect to each of the four counts of the indictment of which you stand convicted, that you be fined in the sum of $10,000, a total fine of $40,000.

It is the further judgment and sentence of the Court that you be committed to the custody of the Attorney General or his authorized representative for a term of four years on each count of the indictment. Execution of prison sentence is suspended, and the defendant is placed on probation for a term of five years, subject to the usual conditions of probation, and subject to the special condition that in connection with any business owned or operated by this defendant she maintain full and complete books and records of the receipts and expenditures of the business in order to permit an accurate determination of the adjusted gross income of that business under the Internal Revenue Code, and that she each year cause to be filed a full and complete and accurate income tax return under the Internal Revenue Code for each business in which she has any interest or any responsibility with respect to the tax obligation under the Internal Revenue Code . . . .

Mr. Conforte, under each of the four counts of the indictment of which you have been convicted, the Court fines you in the sum of $10,000, a total fine of $40,000.

The Court sentences you to the custody of the Attorney General for a period of five years on Count VII of the indictment.

In sentencing Mrs. Conforte I took into consideration the fact that she has no prior criminal record of any sort, and has demonstrated to the satisfaction of the Court that she suffers from several different ailments which would make it hazardous to her health to be incarcerated.

With respect to Mr. Conforte, he has two prior felony convictions, one of which involved income tax evasion. Because of that I don't think he is a proper subject for probation. However, because of the kind of offenses of which he has been convicted at this time, it seems to me that in the absence of some other consideration, in view of his past criminal record and in view of the recommendations that have been received, normally a five-year sentence would be adequate. . . .

On Counts VIII, IX and X, it is the judgment and sentence of the Court that in addition to the fine the defendant be committed to the custody of the Attorney General or his authorized representative for a term of five years on each count.

It is the order of the Court that the sentences under Counts VIII, IX and X will run consecutively to the sentence under Count VII; and the sole and only reason for making those three additional five-year terms consecutive is because of my opinion that this defendant has no constitutional right to file the types of income tax returns which he files; that he is in a legitimate business and he has the same obligation as any other businessman to keep accurate books and records and to make full disclosure to the Internal Revenue Service of his receipts and disbursements so that an accurate determination of his adjusted gross income and his tax liability can be made.

If those kind of income tax returns, paying out an arbitrary amount that he voluntarily pays the Government, refusing to disclose the details of receipts and disbursements as required by the law, and relying upon a nonexistent constitutional right to refuse to file such returns had not been filed by this defendant, the sentences under Counts VIII, IX and X would have, by this Court, have been made to run concurrently with the sentence under Count VII.

The defendants are remanded for execution of sentence.

undisclosed computation of net worth. No other information is furnished because the taxpayer claims a Fifth Amendment privilege against any additional disclosure. Judge Thompson felt very strongly that the Confortes were not entitled to file such limited returns, and he candidly informed the defendants and their counsel that the sentences were designed to assure that the "Sullivan" return question would be addressed and decided by the appellate courts.

## C. The "Newly Discovered Evidence."

In their motions for a new trial, the defendants allege that following their convictions they discovered evidence which indicates that Judge Thompson harbored a personal bias against them at the time of their trial and sentencing. The evidence relates to two incidents: (1) comments made by Judge Thompson in a 1973 letter on behalf of the Reno Unit of the American Contract Bridge League; and (2) remarks allegedly made by Judge Thompson at a cocktail party following a football game in 1973. As developed at the evidentiary hearing, the facts regarding these two incidents may be summarized as follows:

## 1. The Bridge Club Letter.

In late 1972, Mr. Conforte submitted a membership application to the Reno Unit of the American Contract Bridge League. At the time that Mr. Conforte applied for membership, Judge Thompson was the president of the Reno Unit. When Mr. Conforte's application was received by the Board of Directors there was extensive discussion as to whether or not it should be accepted. Although prostitution was not illegal in Storey County, Nevada, the women on the Board objected to Mr. Conforte being a member of their organization because of his occupation. During the discussion, Judge Thompson also informed the Board members of Mr. Conforte's felony record.

The consensus of the Board was that, if possible, Mr. Conforte's application to the Reno Unit should be rejected. As president, Judge Thompson was asked to write to the national organization for guidance on the procedure and the propriety of declining to accept Mr. Conforte as a member. The Board also felt that Judge Thompson was an appropriate person to write the inquiry because it was anticipated that rejection of the application might raise legal questions and that he would be able to understand any such discussion.

On February 2, 1973, Judge Thompson wrote on court stationery to the national headquarters of the League and presented the questions which had been raised by the Board regarding Mr. Conforte's application.[4] The letter was straightforward in

4. The full text of the letter was as follows:

Chambers of
Bruce R. Thompson
United States District Judge

February 2, 1973

American Contract Bridge League
2200 Democrat Road
Memphis, Tennessee 38131
Gentlemen:

At the Reno Regional, the end of December, one of the ACBL Directors accepted and turned over to the membership chairman of the Reno Unit an application and dues from one Joseph Conforte. The membership chairman, in turn, forwarded the application to national headquarters.

Our by-laws prescribe "good moral character" as a qualification for membership. The matter has been discussed by the Board of Directors of the Reno Unit and we do not wish to have Mr. Conforte as a member. At least, we do not wish to associate with him. Mr. Conforte has twice been convicted of felonies, extortion and income tax evasion and has served terms in state and federal penitentiaries. He is a notorious bawdy house keeper and is presently engaged in that business in nearby counties. There is nothing wrong or objectionable with his conduct at the bridge table. We understand he desires to participate in ACBL activities, particularly at regional and national tournaments, and recently played in the Hawaii Regional.

I suppose there are a good many members floating around in ACBL who would not be acceptable associates for persons with moral scruples, but there is an obvious difference between regular association with an undesirable character in a small local unit and playing bridge against some stranger in a regional or national tournament.

Our questions are:

1. May we revoke Conforte's membership?

expressing the Board's opinion that Mr. Conforte was not of "good moral character" and that he was not the sort of person with whom the members of the unit desired to associate.

In response to his letter, Judge Thompson was advised by the general counsel to the American Contract Bridge League that rejection of Mr. Conforte's application on the grounds stated by the Board appeared to be appropriate. A majority of the Board then voted to deny membership to Mr. Conforte. Again using his court stationery, Judge Thompson wrote to the defendant informing him of the decision of the Reno Unit and forwarding a check for $3 as a refund of the application fee. The rejection by the bridge club had a profound effect upon Mr. Conforte. He was very upset, and his pride was so hurt that he tore up the check and the letter from Judge Thompson and declined to tell any of his acquaintances about the incident.

### 2. The Football Cocktail Party.

In the fall of 1973, the University of Nevada-Reno defeated the University of Nevada-Las Vegas in football. After the game there was a cocktail party at the home of one of the Reno assistant coaches who was the son of Judge Thompson's secretary. Judge and Mrs. Thompson attended, together with about fifty other guests. Also at the party was Mr. Roy Woofter who at the time was the district attorney for Clark County (Las Vegas), Nevada, and a good friend of Mr. Conforte. Mr. Woofter was with a group of four other persons.

2. May we accept his membership but bar his participation in Reno Unit activities?

3. Is it possible to be an ACBL member without belonging to a local unit?

Your prompt attention will be appreciated.

Very truly yours,

s/ Bruce R. Thompson

Pres., Reno Unit

P.S. Some of the board members anticipate, or apprehend, as the case may be, that Conforte may invite one of his "ladies" as his partner for a unit game. This possibility was not included in the body of the letter because the reaction of our mixed board was ambivalent.

At the party, a conversation took place between Mr. Woofter and Judge Thompson during which Mr. Conforte's name was mentioned. The exact contents and circumstances of the conversation are in dispute, and much of the evidence produced at the hearing on the new trial motions concerned this incident. After evaluating and weighing the credibility of the testimony given by various witnesses, the court concludes that the most believable evidence supports the following findings of fact:

a. The head coach of the Reno football team in 1973 was Mr. Jerry Scattini. At the party, Mr. Woofter and Judge Thompson were engaged in a conversation with several other persons regarding Mr. Scattini's coaching ability. It was generally agreed that Mr. Scattini was a good coach, but that the Reno team would be better if it had greater financial support. In connection with the discussion about financial backing for the team, Mr. Conforte was mentioned as a possible source of funds.

b. Judge Thompson was, and is, strongly opposed to amateur athletics at the University of Nevada being associated with and financially supported by one who is engaged, as Mr. Conforte is, in the business of running a house of prostitution.

c. In response to the comment that Mr. Conforte might contribute to the team, Judge Thompson made a statement to the effect that the only problem with coach Scattini was that he was a good friend of Mr. Conforte and that Mr. Conforte was "not good for Reno."[5]

5. Several of the people who attended the party with Mr. Woofter and who overheard parts of the conversation with Judge Thompson testified that the judge made a stronger statement, saying that Mr. Conforte should be "run out of town." Judge Thompson does not recall the conversation about Mr. Conforte, but states that it is very unlikely that he would have made any such remark. Mr. Woofter, the person who was most directly involved in the conversation and who later contacted the other witnesses about their recollections and their willingness to testify for Mr. Conforte, stated on cross-examination that he did not specifically recall Judge Thompson saying that Conforte

## II

The defendants' primary contention on this motion is that a new trial should be granted because of Judge Thompson's failure to recuse himself under the provisions of 28 U.S.C. § 455. The statute, completely rewritten by Congress in 1974, provides in pertinent part:

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

. . . . .

(e) No justice, judge, magistrate, or referee in bankruptcy shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

The stated purpose of the revision of section 455 was to "broaden and clarify the grounds for judicial disqualification," to "enhance the public confidence in the impartiality of the judicial system," and to eliminate the "so-called 'duty to sit' . . ." 3 U.S.Code Cong. & Admin.News (1974) pp. 6351, 6355. *See generally* 13 Wright, Miller & Cooper, *Federal Practice and Procedure*: Jurisdiction §§ 3541–53 (1975); Note, *Disqualification of Federal Judges for Bias Under 28 U.S.C. Section 144 and Revised Section 455*, 45 Fordham L.Rev. 139 (1976). Although the statute imposes a self-enforc-

ing duty on the judge, its provisions may be asserted by a party to the action by means of a motion in the trial court, by mandamus, or on appeal. *Davis v. Board of School Commissioners*, 517 F.2d 1044, 1051 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *cf.* 28 U.S.C. § 144, which establishes a specific procedure by which a litigant may challenge the impartiality of a district court judge prior to or during a trial.

The issue of judicial disqualification raised by the defendants is a difficult and sensitive one that goes to the heart of our system of justice. In 1938, Judge Frank, writing for the Second Circuit Court of Appeals, discussed the problem with great insight:

Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness. If, however, "bias" and "[im]partiality" be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will. The human mind, even at infancy, is no blank piece of paper. We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are pre-judices. . . . Interests, points of view, preferences, are the essence of living. Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference.

. . . . .

. . . Much harm is done by the myth that merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and

---

should be "run out of town" and that he might have merely inferred that sentiment from the judge's statement that Conforte was "not good for Reno." The testimony of the witnesses who overheard the conversation must be largely discredited because it appears that their recollections as to Judge Thompson's exact words

were based more on a power of suggestion four years after the incident than on any direct memory of the event in question. Therefore, I have concluded as a matter of fact that Judge Thompson *did not* say that Mr. Conforte should be "run out of town."

strips himself of all predilections, becomes a passionless thinking machine. The concealment of the human element in the judicial process allows that element to operate in an exaggerated manner; the sunlight of awareness has an antiseptic effect on prejudices. Freely avowing that he is a human being, the judge can and should, through self-scrutiny, prevent the operation of this class of biases. . .

. . . . .

Disinterestedness does not mean childlike innocence. If the judge did not form judgments of the actors in those courthouse dramas called trials he could never render decisions.

*In re J. P. Linahan*, 138 F.2d 650, 651–54 (2d Cir. 1938).

With these basic principles in mind, this court must proceed to carefully analyze and consider the defendants' contention that they should receive a new trial because Judge Thompson was impermissibly biased and prejudiced against them. The defendants assert three factual grounds to support their allegations of bias: (1) Judge Thompson's statements at the time of sentencing regarding the "Sullivan" tax returns, (2) the severity of the sentences imposed on Mr. Conforte, and (3) the judge's 1973 comments about Mr. Conforte in the bridge club letter and at the football cocktail party.

### A. The "Sullivan" Tax Returns.

█ The defendants contend that Judge Thompson's statements expressing his strenuous disapproval of Mr. Conforte's use of "Sullivan" returns reflect an undisclosed bias against Mr. Conforte and his tax counsel, Mr. Clyde Maxwell, who appeared as a witness during the trial. They argue that because of his strongly held opinion on the matter of the tax returns, Judge Thompson was required under the provisions of section 455 to disqualify himself from hearing the defendants' case. This argument is not persuasive. It is universally held that adverse judicial rulings on legal or factual matters or the judge's views on particular legal issues do not support an inference of bias against a party sufficient to require recusal. *United States v. Azhocar*, 581 F.2d 735 at 738 (9th Cir. 1978); *United States v. Haldeman*, 181 U.S.App.D.C. 254, 357, 559 F.2d 31, 133 n. 300 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Botts v. United States*, 413 F.2d 41, 44 (9th Cir. 1969); cf. *Duplan Corp. v. Deering Milliken, Inc.*, 400 F.Supp. 497 (D.S.C.1975), *aff'd on other grounds*, 522 F.2d 809 (4th Cir. 1975) (even erroneous rulings are not grounds for disqualification due to bias when subject to correction on appeal).

This rule is well founded in reason:

[I]f the words "impartiality might reasonably be questioned" and "avoid impropriety and the appearance of impropriety" were to be interpreted to encompass judicial rulings in the course of a trial or other proceeding, . . . then there would be almost no limit to disqualification motions and the way would be opened to a return to "judge shopping", a practice which has been for the most part universally condemned. Certainly every ruling on an arguable point during a proceeding may give "the appearance of" impartiality, in the broadest sense of those terms, to one party or the other.

*Lazofsky v. Sommerset Bus Co.*, 389 F.Supp. 1041, 1044 (E.D.N.Y.1975). Therefore, Judge Thompson's opinion about the legality of the defendants' use of the "Sullivan" return cannot be accepted as a ground for disqualification under section 455.

█ The defendants present no convincing evidence of any personal bias against Mr. Maxwell. Even if Judge Thompson's disapproval of Mr. Maxwell's tax advice could be construed as an indication of some prejudice against Mr. Maxwell himself, it is clear that a judge's bias against an attorney is not sufficient to establish the kind of bias against a party which is necessary to warrant disqualification. *Davis v. Board of School Commissioners, supra*, 517 F.2d at 1049–52; *United States v. Zagari*, 419 F.Supp. 494, 504–05 (N.D.Cal.1976).

**B. Severity of the Sentence.**

 As a second alleged indication of impermissible prejudice against them, the defendants point to the sentence which Judge Thompson imposed on Mr. Conforte following his conviction. They contend that the imposition of a maximum sentence of four consecutive five-year prison terms for a tax offense is so harsh and severe as to demonstrate the judge's bias. Even discounting the fact that Judge Thompson had himself acquitted the defendants on six of the ten counts with which they were charged, this contention cannot stand. The severity of a sentence, if within the statutory limits, cannot support a claim of personal bias. *Knapp v. Kinsey*, 232 F.2d 458, 466 (6th Cir. 1956); *Calvaresi v. United States*, 216 F.2d 891, 900 (10th Cir. 1954); *United States v. Nehas*, 368 F.Supp. 435, 437 (W.D. Pa.1973).

Furthermore, in this case there are particular reasons not to regard the sentence as proof of bias. During the sentencing proceedings Judge Thompson made it clear that "the sole and only reason for making those three additional five-year terms consecutive is because of my opinion that this defendant has no constitutional right to file the type of income tax return which he files." The judge patently aimed the sentence more at the Court of Appeals than at Mr. Conforte and clearly stated on the record that if the defendant's so-called "Sullivan" tax returns were found to be constitutionally protected, then the consecutive aspect of the sentence would be invalid. In addition, the judge stated that he might later modify or reduce the sentence. Thus, it is clear that in this case the propriety of the sentence is strictly a matter for appeal and not a question of personal bias.

**C. The Bridge Club Letter and Cocktail Party Comments.**

The defendants' most strenuous arguments in support of their position that Judge Thompson violated the provisions of section 455 by failing to disqualify himself are based on the judge's comments about Mr. Conforte in the bridge club letter and at the football cocktail party. The problems presented by these two incidents are more complex than those raised by either the "Sullivan" return statements or the harshness of Mr. Conforte's sentence, and a somewhat more extensive discussion is required.

**1. Timeliness of the Motion.**

 An initial difficulty with the defendants' contention that they should receive a new trial because of Judge Thompson's 1973 prejudicial statements about Mr. Conforte is their failure to raise the question prior to the trial. The requirement that an assertion of judicial bias must be made in a timely manner is found in 28 U.S.C. § 144,[6] and it has been construed to demand that a party raise the disqualification issue at the earliest moment after discovery of the facts allegedly supporting recusal. *See United States v. Hurd*, 549 F.2d 118, 119 (9th Cir. 1977); *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *Duffield v. Charleston Area Medical Center, Inc.*, 503 F.2d 512, 515–16 (4th Cir. 1974); *Lucas v. United States*, 325 F.2d 867, 869 (9th Cir. 1963); *Rademacher v. City of Phoenix*, 442 F.Supp. 27, 29 (D.Ariz.1977); *cf. Hawaii-Pacific Venture Capital Corp. v. Rothbard*, 437 F.Supp. 230, 234 (D.Hawaii 1977) (new sec-

---

**6.** 28 U.S.C. § 144 provides:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

tion 455 does not abrogate section 144 timeliness requirement).[7]

With respect to the cocktail party statements, it appears from the evidence that the defendants and their counsel were not aware of the facts prior to the trial of this case. As to the comments made in the bridge club letter, however, there is convincing evidence that Mr. Conforte had sufficient notice of Judge Thompson's attitude about his membership in the club to make his post-trial assertion of that particular ground for disqualification untimely.

Mr. Conforte knew in 1973 that Judge Thompson was the president of the Reno unit to which he applied for membership and that the letter of rejection which he received was signed by Judge Thompson. In fact, the defendant testified that he had a very deep emotional reaction to the notice of rejection, in part because of the fact that it was sent to him by the judge. There is no question that, at the time of their extensive pretrial discussions concerning the advisability of waiving a jury, the defendants' counsel were unaware of the bridge club incident. However, Mr. Conforte was aware of it. He may not have known specifically of the letter which Judge Thompson wrote to the bridge league, but he knew three years before the trial, and vividly remembers it today, that Judge Thompson informed him that he was not wanted as a member of the Reno unit.

Having remained silent about the bridge club incident until after his conviction, the defendant cannot reasonably be permitted to claim that his assertion of that basis for Judge Thompson's disqualification is timely. This is particularly true in view of the fact that the issue is raised for the first time in this motion for a new trial on the grounds of newly discovered evidence. In order to sustain such a motion, it must appear that the evidence relied on is in fact newly discovered. *United States v. Brashier*, 548 F.2d 1315 (9th Cir. 1976). Therefore, insofar as the defendants rely on the bridge club letter to support their motion, the untimeliness issue is dispositive. It is still necessary, however, to consider whether Judge Thompson's cocktail party statements are themselves sufficient to establish grounds for disqualification under section 455.[8]

---

7. Defendants deny the applicability of the timeliness requirement on the grounds that their motion relies only on section 455, not on section 144, and that section 455 does not include a rule regarding timeliness. *See SCA Services, Inc. v. Morgan*, 557 F.2d 110, 117 (7th Cir. 1977) (Denial of disqualification on procedural grounds of untimeliness, waiver or estoppel is improper where basis for recusal is family relationship under section 455(b)(5)). It is clear, however, that the personal bias and prejudice provisions of the two sections are in pari materia and that the statutes should consequently be construed together. While section 144 sets forth specific procedural safeguards, section 455 is wholly silent about procedure. Thus, it is sensible to use section 144's procedural framework to fill the gap in section 455. To do otherwise would allow any litigant to evade the procedure established in section 144 by simply ignoring that section in favor of section 455. The result would be to effectively repeal section 144 and render it meaningless.

Furthermore, the application of a timeliness requirement with regard to the assertion of claims of personal bias is supported by substantial considerations of policy. The purpose of such a requirement is to prevent litigants from abusing motions to disqualify as dilatory tactics or as a means to "sample the temper of the court" before deciding whether to raise an issue of disqualification. *Peckham v. Ronrico Corp.*, 288 F.2d 841, 843 (1st Cir. 1961); *Rademacher v. City of Phoenix*, 442 F.Supp. 27, 29 (D.Ariz.1977). As stated in a recent case:

There are strong policy reasons for strictly construing the timeliness requirement. Without such control, a party could speculate on the court's final judgment, withhold information learned before trial, and disqualify the judge if the decision went against him. Further, it is intolerable that a court should so lightly allow the adversary to be put to the expense of a second trial and face all the other problems of long delays in trying a matter.

*Rousell v. Tidelands Capital Corp.*, 438 F.Supp. 684, 691 (N.D.Ala.1977).

8. Since the underlying attitude toward Mr. Conforte evidenced in the bridge club letter and in the cocktail party conversation is essentially the same, the statutory analysis is equally applicable to both of these factual grounds for the defendants' motion. Assuming arguendo that the defendants' contentions regarding the bridge club letter were timely raised, the following discussion is dispositive of defendants' claim that the bridge club incident required Judge Thompson's disqualification.

## 2. Application of Section 455(a).

■■■ Section 455(a) requires disqualification when a judge's impartiality "might reasonably be questioned." The standard is objective and requires recusal whenever there is a "reasonable factual basis for doubting the judge's impartiality."[9] As Justice Frankfurter has stated, "The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as to be so in fact." *Public Utilities Commission v. Pollak*, 343 U.S. 451, 466–67, 72 S.Ct. 813, 823, 96 L.Ed. 1068 (1952) (Frankfurter, J., recusing himself in a separate opinion). Although the standard of a "reasonable factual basis" is somewhat nebulous, it seems clear that Judge Thompson's expressions of his negative feelings about Mr. Conforte at the football cocktail party do raise reasonable doubts about his impartiality and do create at least an appearance of some bias against the defendant.

■■■ However, section 455(e) permits waiver of the disqualification required by subsection (a), provided that the waiver is "preceded by a full disclosure on the record of the basis for disqualification." It appears without question from the record that such a waiver was made by the defendants in this case. During the hearing on the jury waiver, Judge Thompson took care to explain to the defendants and their counsel that he was well aware of Mr. Conforte's past criminal activity and that his knowledge of the defendant was such that he would not be qualified to sit as a juror on a case against Mr. Conforte. He then asked the defendants if they understood and were willing to waive "any basis of disqualification because of my prior knowledge of the facts concerning Mr. Conforte." The defendants expressly agreed to such a waiver, but they now claim that the waiver was invalid because it was not preceded by "full" disclosure of the basis for disqualification.

■■■ In support of their claim that the waiver was invalid, the defendants strenuously argue that, before Judge Thompson could accept an effective waiver of his disqualification under section 455(a), it was necessary for him to disclose to the defendants the specific facts which gave rise to an appearance of bias on his part, i. e., the bridge club letter and the cocktail party comments. Such a standard of disclosure, however, cannot reasonably be imposed. The statute requires that a waiver be preceded by a full statement of the basis for disqualification; it does not impose on a judge the impossible task of recalling and reciting every incident or factual detail which might contribute to the overall impression of partiality.[10] It would strain cre-

---

**9.** The legislative history of the revision of section 455 includes some elaboration on the application of this standard:

> Subsection (a) of the amended section 455 contains the general, or catch-all, provision that a judge shall disqualify himself in any proceeding in which "his impartiality might reasonably be questioned." This sets up an objective standard, rather than the subjective standard set forth in the existing statute through use of the phrase "in his opinion." This general standard is designed to promote public confidence in the impartiality of the judicial process by saying in effect, if there is a reasonable factual basis for doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case.
>
> . . . . . . . .
>
> At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his im-

partiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

3 U.S.Code Cong. & Admin.News (1974) pp. 6354–55. *See United States v. Ritter*, 540 F.2d 459, 462 (10th Cir.), *cert. denied sub nom. Olson Farms, Inc. v. United States, et al.*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *Mavis v. Commercial Carriers, Inc.*, 408 F.Supp. 55, 61 (C.D.Cal.1975).

**10.** Such a requirement would be completely unrealistic. Indeed, in the instant case it would have been impossible for Judge Thompson to

dulity to assume that, in imposing a requirement of "full disclosure," Congress intended that an express and deliberate waiver of disqualification such as that made by the defendants in this case would be invalid and a new trial required merely because the judge did not burden the record with a litany of his every thought or remark concerning the defendant during a period of over four years.

 Therefore, while it is true that Judge Thompson's advice to the defendants regarding the problem of his disqualification did not include any reference to the particular incidents which are the subject of this motion, there is no doubt that the defendants were sufficiently apprised of the basis for the judge's negative views about Mr. Conforte—that is, the judge's knowledge of Mr. Conforte's criminal past—so as to make their waiver a knowing and intelligent one. The legislative history of the revision of section 455 suggests that judges have a measure of discretion with respect to recusal under section 455(a): "The issue of disqualification is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion." 3 U.S.Code Cong. & Admin. News (1974) pp. 6351, 6355. *See also United States v. Haldeman, supra,* 559 F.2d at 139; *United States v. Patrick, supra,* 542 F.2d at 390. Under the circumstances of this case Judge Thompson's acceptance of the defendants' waiver was an exercise of judicial discretion fully permitted by section 455(e).

As a second ground of attack on the validity of their waiver of Judge Thompson's disqualification, the defendants rely on the provisions of canon 3 C of the American Bar Association's Code of Judicial Conduct as adopted and amended by the United States Judicial Conference. This canon is almost identical to section 455 except that, since 1975, the canon has eliminated the provision for waiving disqualification, so that even if the judge's impartiality is merely questionable, as contemplated by section 455(a), he is to step down in all cases. *See* Code of Judicial Conduct, Canon 3 C(1), 69 F.R.D. 273, 277 (1975). In addition, the canons state that they prevail over any less restrictive statutes. *Id.* at 273. The defendants argue that, in view of this provision, Judge Thompson erred in accepting their waiver of his disqualification and a new trial is required.

 The only decisions cited by the defendants in support of their assertion are cases in which judges relied on the canons as a basis on which to disqualify themselves before a trial had begun. *Smith v. Sikorski Aircraft,* 420 F.Supp. 661 (C.D.Cal. 1976); *Spires v. Hearst Corp.,* 420 F.Supp. 304 (C.D.Cal.1976). There do not appear to be any cases reversing a lower court's failure to recuse based on the canons. This is understandable because, as a practical matter, the disqualification provisions of the Code of Conduct can only be construed as establishing a standard for judicial behavior rather than as imposing a mandatory duty enforceable after the fact by the reversal of otherwise proper judicial decisions. The reason for this construction of the canons is enunciated in *Duplan Corp. v. Deering Milliken, Inc., supra,* 400 F.Supp. at 504–05:

> A federal judge who has become active in a proceeding has the benefit of statutory guidance as to when and under what conditions he should disqualify himself. A judge in his official capacity is not responsible to the Judicial Conference but to the people; the people exercise control over judges through the Congress of the United States. If the statutory guidelines on recusal which were promulgated by Congress do not require the disqualification of a presiding judge, and indeed may impose upon him a duty *not* to recuse himself, it is inconceivable that the Judicial Conference intends to order him to disobey the Congressionally-imposed duty.

This court is therefore of the opinion that, once a federal judge has commenced

disclose to the defendants the facts regarding his cocktail party statements because he did not, and does not now, have any memory of that conversation about Mr. Conforte.

his deliberations in a particular action, any challenge to his continued consideration of that matter, based on grounds for which Congress has provided a remedy, must employ those remedies and not the Code of Judicial Conduct. (emphasis in original)

■ The waiver of Judge Thompson's disqualification made by the defendants in this case fully satisfied the statutory requirements of section 455(e). At the time the waiver was made the defendants did not raise any question regarding the Code of Judicial Conduct. At this point in time, following their trial and conviction, they may not rely on the canons to challenge the validity of their knowing waiver.

3. Application of Section 455(b)(1).

■ Section 455(b)(1) mandates recusal where a judge "has a personal bias or prejudice concerning a party." It is the first in a series of specific statutory grounds for judicial disqualification, including financial interest or family relationship, which, in contrast to the more generalized proscription of section 455(a), may not be waived by the parties to an action. The term "personal bias or prejudice" used in section 455(b)(1) was taken directly from 28 U.S.C. § 144,[11] and it is uniformly held that the case law under the latter section controls the interpretation of this clause. *See, e. g., United States v. Haldeman, supra,* at 133; *Davis v. Board of School Commissioners, supra,* 517 F.2d at 1052. The basic question presented by a charge of bias or prejudice under section 144 or 455 is whether the facts establish that the judge has in some manner demonstrated "a bent of mind that may prevent or impede impartiality of judgment." *Berger v. United States,* 255 U.S. 22, 33–34, 41 S.Ct. 230, 233, 65 L.Ed.

481 (1921). Accordingly, the test for disqualification under section 455(b)(1) requires a showing of bias in fact rather than merely an appearance of impartiality as required under section 455(a). In addition, it is a well-established rule that the term "personal bias or prejudice" as used in the recusal statutes applies, by definition, only to "personal" as distinguished from "judicial" bias. The preeminent statement of this rule was made by Justice Douglas in *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966): "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *See United States v. Azhocar, supra,* 581 F.2d at 739; *United States v. Haldeman, supra,* at 132.

■ The basic rationale of the rule lies in the distinction between the judicial opinions or biases developed by a judge during the course of court proceedings and personal opinions or biases which have their origins in sources outside the courtroom. The former are generally regarded as inevitable and, in fact, as essential to judicial decisionmaking. The latter form of prejudices, although they are also inevitable and necessary, are regarded as being potentially dangerous and disruptive of the objectivity and impartiality which are the essence of the administration of justice. The extra-judicial source rule has also traditionally served the more practical purpose of preventing parties from using the claim of partiality as a pretext for judge-shopping or challenging adverse rulings of law or fact which should properly be addressed only through the appellate process.[12]

---

11. See note 6, *supra.*

12. Although it is generally regarded as a maxim of recusal law, the "extra-judicial source" rule has not developed without some confusion and inconsistency. Some courts have suggested that there may be an exception to the rule for cases in which contacts during a judicial proceeding create such a degree of prejudice against a party or his counsel that impartiality

is impossible. *See Wolfson v. Palmieri,* 396 F.2d 121, 124–25 (2d Cir. 1968); *Rosen v. Sugarman,* 357 F.2d 794, 798 (2d Cir. 1966). However, in view of the weighty policy considerations supporting the extra-judicial source rule, it would seem that such relatively unusual problems of egregious "judicial" bias should be addressed and resolved under the constitutional doctrines of due process or fair trial rather

In their motion for a new trial the defendants assert that, beyond creating a mere appearance of impartiality, the facts of this case support a finding that Judge Thompson harbored the kind of personal bias against them which is proscribed by section 455(b)(1) and which requires mandatory, non-waivable disqualification. This contention must be rejected, however, because the evidence presented by the defendants fails to show any actual bias or prejudice of extra-judicial origin sufficient to warrant recusal.

■ There is no question that Judge Thompson holds, and held at the time of the trial of this case, a negative opinion about the defendant Joseph Conforte. In connection with the hearing on this motion, the judge candidly testified that he believes that Mr. Conforte is not a person of "good moral character," and that he has held this view "during all the time that I have had anything to do with Joseph Conforte." This opinion was expressed by Judge Thompson in his 1973 comments about the defendant in the bridge club letter and at the cocktail party. However, a simple negative opinion about a defendant does not automatically constitute "personal bias or prejudice" requiring disqualification of a judge.

In the instant case, it is clear that Judge Thompson's opinions about Mr. Conforte are not of extra-judicial origin. They arose, rather, out of numerous judicial proceedings before the judge over a 15-year period. In the course of those proceedings

Judge Thompson learned of Mr. Conforte's prior conviction for extortion, of his activities as the proprietor of a house of prostitution, and of his recurrent difficulties with the Internal Revenue Service. Although the judge's personal knowledge of Mr. Conforte's activities may have been supplemented by facts gleaned from sources such as newspaper reports or general discussions of the defendant's reputation, it is impossible to say that the *origin* of Judge Thompson's impressions about Mr. Conforte is not inextricably bound up with the judicial proceedings over which he presided.

■ It cannot reasonably be argued that such opinions, formed by a judge on the basis of facts learned in prior proceedings, require disqualification. Such a rule would mandate that a defendant be entitled to a different judge each time he was tried. If this premise were carried to its final conclusion, a judge who tried a case and placed a defendant on probation would not be permitted to sit at a probation violation proceeding. Clearly the law does not require such a result. *See United States v. De La Fuente,* 548 F.2d 528, 541 (5th Cir.), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977); *United States v. Montecalvo,* 545 F.2d 684, 685 (9th Cir. 1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2184, 53 L.Ed. 229 (1977); *United States v. Haldeman, supra,* 559 F.2d at 133, n. 300.

■ Furthermore, even disregarding the fact of their judicial origin, the opinions held by Judge Thompson do not constitute an actual bias or prejudice against the de-

than in the context of the disqualification statutes. See note 13, *infra.*

Another element of confusion has arisen because of some inconsistency in the cases as to whether the "extra-judicial source" rule requires that the judge's bias be expressed in extra-judicial conduct, as opposed to statements or conduct in the courtroom. *See Mayberry v. Maroney,* 558 F.2d 1159, 1162 (3d Cir. 1977); *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1052 (5th Cir. 1975); *Tenants, etc. v. United States Dept. of H.U.D.,* 338 F.Supp. 29, 32–34 (N.D.Cal.1972). Again, the underlying policy considerations of the rule should resolve this confusion. The purpose of the extra-judicial source requirement concerns the origin of the judge's bias rather than the

place of its expression. Certainly, judicial rulings or comments on the evidence made during the course of a proceeding do not fall within the rule. However, if a judge's statements or conduct during a trial refer to or reflect bias or prejudice which arose outside of his judicial duties, then the extra-judicial source rule is satisfied and recusal may be required. Conversely, the fact that a judge has made statements outside the courtroom does not automatically mean that those statements reflect "personal" as opposed to "judicial" opinions, because the origin of the opinion may lie squarely within his judicial experience. *See United States v. Haldeman,* 181 U.S.App.D.C. 254, 360, 559 F.2d 31, 136 (1976).

fendant sufficient to meet the test for recusal under section 455(b)(1). Mr. Conforte's occupation and prior convictions are such as to make the judge's views about his moral character quite unexceptional, even in an era of increased ethical relativism. Indeed, if such an opinion were grounds for judicial disqualification, it is unlikely that a "qualified" judge could be found to decide this case. It is a well accepted maxim of law, often called the "rule of necessity," that if all judges are disqualified to hear a case, then none are disqualified. *See, e. g., Evans v. Gore,* 253 U.S. 245, 247–48, 40 S.Ct. 550, 64 L.Ed. 887 (1920); *Atkins v. United States,* 556 F.2d 1028, 1036 (Ct.Cl.1977); *Dimes v. Grand Junction Canal,* 3 H.L.C. 759, 787–88, 10 Eng.Rep. 301, 313 (1852). While this rule may not be strictly applicable to the instant case, its pragmatic approach and the recognition that absolute neutrality is a fiction combine to militate against a new trial of the defendants.

To disqualify a judge for expressing the views held by Judge Thompson about Mr. Conforte would perpetuate "the myth that merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections." *In re J. P. Linahan, supra,* 138 F.2d at 652–53. The spirit of realism with respect to the issue of judicial disqualification was recently expressed by the Third Circuit Court of Appeals where personal bias was defined as "an attitude toward petitioner that is significantly different from and more particularized than the normal, general feelings of society at large against convicted wrongdoers." *Mims v. Shapp,* 541 F.2d 415, 417 (3d Cir. 1976). Judge Thompson's remarks about Mr. Conforte do not evidence such an attitude. *Cf. United States v. Nehas,* 368 F.Supp. 435 (W.D.Pa.1973) (Personal bias does not include views based upon "attitudes common to the public generally").

■ Additional factors are present here which belie the defendants' charge of personal bias requiring recusal. Judge Thompson's attitude toward Mr. Conforte has been the same during all the time they had any contact with one another. Nonetheless, Judge Thompson ruled in favor of Mr. Conforte in unrelated matters in 1968 and 1970. Defendants do not claim that any hint of personal bias tainted those decisions. It is also significant that Judge Thompson presides over a single judge court, being the only federal district court judge in Reno. While distance is not an insurmountable barrier to recusal, the relative availability of other judges is a relevant and proper consideration in a decision regarding judicial disqualification. *School District of Kansas City, Mo. v. State of Missouri,* 438 F.Supp. 830, 835 (W.D.Mo.1977); *United States v. Quattrone,* 149 F.Supp. 240, 242 (D.D.C.1957).

■ For all of these reasons, it is this court's conclusion that Judge Thompson did not err in failing to disqualify himself under section 455.[13] The presumption is well established that "a judge approaches each new case with impartiality and conducts the case on its own merits from the evidence there presented." *United States*

---

13. In addition to their claim under section 455, the defendants contend that they should receive a new trial because Judge Thompson's bias against them deprived them of a fair trial in violation of the Due Process Clause of the Fifth Amendment. There is no doubt that the right to a fair and impartial judge who has not pre-judged a case is guaranteed by the Due Process and Fair Trial clauses of the constitution. *See In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *United States v. Brown,* 539 F.2d 467 (5th Cir. 1976); *United States v. Scuito,* 531 F.2d 842 (7th Cir. 1976). Furthermore, this constitutional right exists apart from the statutory disqualification provisions of sections 144 and 455 and may be invoked independently in situations where the statutes do not strictly apply. *See United States v. Scuito, supra,* at 845. For the most part, however, any bias or prejudice that would violate the Due Process or Fair Trial clauses would even more readily violate the statutes, and a separate consideration of the constitutional issues is not required. *See United States v. Haldeman, supra,* 559 F.2d at 130, n. 276. Therefore, the defendants' claims under the constitution are rejected on the same grounds as their statutory claims. They have failed to produce any evidence of bias sufficient to support a finding that they were deprived of due process or that they did not receive a fair trial.

*v. Jeffers,* 532 F.2d 1101, 1112 (7th Cir. 1976). *See United States v. Patrick, supra,* 542 F.2d at 390; *Wolfson v. Palmieri,* 396 F.2d 121, 126 (2d Cir. 1968). The defendants have not overcome that presumption and they are not entitled to a new trial on the grounds of judicial bias or prejudice against them.

### III

The defendants' second major contention in support of the instant motion concerns the validity of their waiver of the right to a jury trial. They assert that Judge Thompson's failure to disclose the facts surrounding the bridge club incident and the cocktail party conversation and his failure to inform them of his opinion regarding the "Sullivan" returns render their waiver of a jury trial invalid, thus mandating a new trial. Obviously, this argument is closely related to the defendants' claim of personal bias; and, like that contention, it must also be rejected.

 The right to trial by jury is guaranteed by Article III and the Sixth Amendment of the United States Constitution, as well as by Rule 23(a) of the Federal Rules of Criminal Procedure.[14] There is little doubt that the waiver executed by the defendants in this case satisfied the requirements of Rule 23(a) since it was signed by the defendants with the approval of the court and the consent of the government. However, as the defendants correctly point out, waiver of the constitutional right to a jury trial must meet a high standard and must be "knowing and intelligent" in order to be valid. *See, e. g., Patton v. United States,* 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930). They argue that the judge's failure to disclose his negative opinions precluded their making a "knowing and intelligent" waiver of a jury.

 The error in the defendants' position lies in their assumption that non-disclosure of the judge's personal opinions de-

prived them of the information necessary to make an informed and intelligent jury waiver. In fact, the type of information required to make a proper jury waiver relates to the defendants' knowledge of their constitutional rights, not to the judge's innermost thoughts or out-of-court statements. Those are matters adequately treated by sections 144 and 455 of the Judicial Code.

The defendants rely primarily on the case of *United States v. David,* 167 U.S.App.D.C. 117, 511 F.2d 355 (1975) in which a new trial was ordered because the trial judge did not sufficiently interrogate the defendant on the jury waiver issue. Their reliance is misplaced, however, because it ignores the reasons for the *David* decision. In that case, the defendant had a substantial history of psychiatric problems, the psychiatrist originally reported that the defendant was incompetent to stand trial, and counsel had expressed concern both as to the defendant's competency and his ability to knowingly waive his jury trial right. *Id.* at 361. For these reasons, the Court of Appeals demanded further inquiry into the waiver. None of those crucial facts is present in this case.

In addition, a closer reading of the *David* opinion reveals the true nature of the understanding required for a valid jury waiver. There, the waiver was insufficient because it was unclear "whether David understood that he had a right to be tried by a jury, whether he understood the difference between a jury trial and a non-jury trial and whether he was mechanically following his attorney's advice without having its basis explained to him." *Id.* at 362. In the present case, it is not only clear that the defendants understood their rights, but they and their attorneys testified that Mr. Conforte actively participated in the lengthy discussions preceding the waiver. Nor did Judge Thompson treat the waiver as a mere "matter of rote." *Patton v. United States, supra.* He explained the

14. Rule 23(a) provides:

> Trial by Jury. Cases required to be tried by a jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government.

differences between a jury trial and bench trial, the burdens of proof, and the requirement of unanimity for a jury to convict. Judge Thompson also specifically raised the issue of his prior acquaintance with the defendant and his criminal record.

The jury waiver in this case passes even the most stringent constitutional scrutiny. As the Third Circuit stated in *United States v. Mitchell*, 427 F.2d 1280 (3d Cir. 1970):

> In view of the signed waiver and the colloquy with the court, the assertion that we are presented with a "silent record" cannot stand. The record is silent only to the extent that it fails to contain any suggestion that appellant's waiver was anything but voluntarily and intelligently entered. Appellant has never argued, or even intimated, that he was incompetent to execute a waiver, that his decision was induced by coercion or promises, . . . or that he did not appreciate the gravity of the offense charged . . . .

*Id.* at 1281–82 (citations omitted). The defendants' waiver of their right to a jury trial was completely voluntary and was knowingly and intelligently made. Their motion for a new trial on the ground of invalidity of the waiver must be denied.

### Conclusion

The motions of both defendants for a new trial are denied.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure this memorandum opinion shall constitute the court's findings of fact and conclusions of law.

IT IS FURTHER ORDERED that the clerk serve copies of this opinion by United States mail upon counsel for the parties appearing in this action.

IT IS FURTHER ORDERED that the clerk shall forward appropriate certified copies to the Court of Appeals for the Ninth Circuit.